**SARATOGA DEVELOPMENT CORPORATION,**
Appellant,

v.

**UNITED STATES of America, et al.**

**SARATOGA DEVELOPMENT CORPORATION,**
Appellant,

v.

**UNITED STATES of America, et al.**

**MINORITY BUSINESS ENTERPRISE LEGAL DEFENSE AND EDUCATION FUND, INC., et al.,**

v.

**UNITED STATES of America, et al.**

**Nos. 92–5019, 92–5020 and 92–5026.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1993.

Decided April 15, 1994.

Bruce A. Baird argued the cause for appellant. With him on the briefs were Wesley S. Williams, Jr. and Alan A. Pemberton.

Richard N. Reback, Asst. U.S. Atty., argued the cause for the federal appellees. With him on the brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, John D. Bates and R. Craig Lawrence, Asst. U.S. Attys. Madeleine Schaller entered an appearance.

Howard B. Possick argued the cause for appellees Federal Triangle Corporation and Delta Partnership. With him on the brief was David L. Kelleher.

Before: WALD, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting opinion filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge:

The Federal Triangle Development Project will produce a federal office complex second in size only to the Pentagon. The appellant, Saratoga Development Corporation, sought to be selected as the project's developer, but the government picked the Delta Partnership instead. Saratoga sued in district court, complaining that the Pennsylvania Avenue Development Corporation ("PADC")—which was in charge of selecting the developer— had failed to follow generally applicable federal procurement law. The PADC claimed that it had not violated those rules, but, more pertinently, it argued that Congress had in fact specified a different set of procurement rules for the project—namely, those the PADC had historically used in competitions for *private* development under PADC supervision. The district court accepted Saratoga's theory as to the applicable rules and found them violated, but held that the violations inflicted no harm on Saratoga. It thus granted summary judgment for the government. *Saratoga Dev't Corp. v. United States,* 777 F.Supp. 29 (D.D.C.1991). We agree with the PADC as to the applicable rules, and find no violation.

## I. Background

### A. *The Pennsylvania Avenue Development Corporation Act of 1972*

Pennsylvania Avenue connects the Capitol and the White House in Washington, D.C. In 1972, finding that the area adjacent to this stretch of the avenue was "blighted" and was not being used "in a manner suitable to its ceremonial, physical, and historic relationship to the legislative and executive branches of the Federal Government", see 40 U.S.C. § 871, Congress created the PADC as a wholly owned government corporation. See *id.* § 872. Congress directed the corporation to devise an overall development plan for the area, *id.* § 874, and gave it two different sorts of authority to implement this plan. Not only could the PADC carry out publicly funded construction and rehabilitation projects, see, e.g., *id.* § 875(16), but it could also regulate *private* development of the PADC area. See, e.g., *id.* § 875(8). Indeed, all private development in the PADC area had to be approved by the corporation. *Id.* § 876(b). Thus, the PADC acts both as a developer in its own right and as a sort of specialized zoning commission.

Acting in its first capacity, the PADC has built new parks, widened and repaved the sidewalks along Pennsylvania Avenue, reconstructed the street itself, and installed amenities such as street furniture and trees. As of 1988, the PADC had spent approximately $100 million in public funds for such projects. Joint Appendix ("J.A.") 425.

But this public spending was intended largely as seed money, designed "to create an entirely new setting for private development". Indeed, from 1977 (when Congress gave the PADC the go-ahead) until the project at issue in this case was launched, the great bulk of the money flowing into the

PADC area was private rather than public. See *id.* (reporting that as of 1988 the PADC's $100 million investment had "attracted $1.4 billion in new private investment throughout the development area"). The principal goal of the PADC's actions as a developer in its own right, then, was to attract private development to be guided by the PADC in its capacity as a zoning commission.

Acting in this latter capacity, the PADC has superintended two different sorts of private development: private development initiated by the developer, and private development initiated by the PADC itself through a "development competition". The PADC has set forth procedures for its role in these two types of private development in a document called *Development Policies and Procedures,* originally adopted in 1980 and amended in 1982 and 1984. See Administrative Record ("A.R.") tab 20. The sections of this document covering the two types are captioned "Policy and Procedures Regarding Development of Privately Owned Sites" and "Policy and Procedures Regarding Development Competitions".

For the first sort of private development, the PADC's zoning role is relatively conventional. In essence, people who own land in the area and who want to develop it must submit detailed proposals to the PADC for approval; if they receive that approval they can build their projects without going through a development competition. (The PADC sometimes helps them assemble the parcels necessary to complete their projects, though they must bear all the costs.)

The second sort of private development superintended by the PADC is initiated by the corporation itself. The PADC acquires whatever parcels are necessary in addition to the ones it already owns. It then holds a "development competition" to decide who will develop them. Assuming both parties can hammer out the details, it sells or leases the parcels to the winner, who then proceeds with the project. Though initiated by the PADC, private development conducted under this procedure is privately financed and produces property that is privately owned.

## B. *The Federal Triangle Development Act of 1987*

By August 1987, the PADC had conducted four "development competitions" for multi-million dollar projects. In 1978 it selected the developer for "National Place", a complex that includes a shopping mall, a hotel, and the National Theater. That same year, the PADC also selected the developer who would refurbish the Willard Hotel. In 1984 came the development competition for Market Square, which combines residential and retail space. Finally, in 1987 the PADC selected the developer for an apartment complex called Lansburgh's.

Congress apparently was quite pleased with this track record. Though federal procurement law generally provides that only the General Services Administration ("GSA") can construct public buildings, the Federal Triangle Development Act of 1987 bypassed the normal mechanisms and entrusted the Federal Triangle Development Project to the PADC, subject to various consultation requirements. See 40 U.S.C. §§ 1101–09. The statute transferred the title for the development site from the GSA to the PADC, *id.* § 1102, and directed the PADC to come up with logistical plans and design criteria for the federal building complex that Congress envisioned, *id.* § 1103. Once these plans and criteria cleared a legislative-veto procedure, cf. *Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the statute instructed the PADC to select the site's developer through a competition "conducted in accordance with the existing policies and procedures of the Corporation for a development competition." 40 U.S.C. § 1104(a)(3).

Although the ultimate cost of the Triangle Project would be borne by taxpayers, Congress arranged not to pay development costs up front. Instead, the PADC and the winning developer would enter into a "development agreement" under which the developer could hold title to the building for up to 35 years after the date on which construction began. *Id.* § 1104(b). The developer would be obliged to lease the building to the GSA, *id.,* at a rental rate calculated to amortize the development costs over the term of the lease,

*id.* § 1105(b)(2). At the end of the lease term, when all the development costs would have been paid, title to the building would be transferred from the developer to the GSA, which would also regain title over the land on which the building was built. *Id.* §§ 1104(b)(2), 1102(a)(2).

C. *The PADC's Implementation of the 1987 Act*

In November 1988, acting under its statutory mandate, the PADC issued a prospectus inviting entrants for its "development competition". The prospectus indicated that the PADC would evaluate proposals according to eight selection criteria, and announced that the PADC "will select the developer whose submission, in its sole judgment, best satisfies all of the selection criteria". J.A. 452.

Most of these criteria—like the applicant's responsiveness to the PADC's development program, the estimated cost of the applicant's proposal, the capability and experience of the development team's members, the track record of the applicant's construction manager, the applicant's ability to adhere to the PADC's schedule, and the proposed architectural design—were rather obvious. But the remaining two criteria were less predictable. Because the federal government would not be paying the development costs up front, the PADC recognized that some form of financing would be necessary, both for the construction period and for the remaining years during which the government was paying rent. Since the cost of the financing would affect the government's rental rate, the government was interested in selecting a developer who would obtain the cheapest possible financing. One of the PADC's eight criteria therefore focused on the applicants' financing proposals. In addition, the PADC announced that it would review each applicant's affirmative-action plan.

Seven development teams submitted proposals before the application deadline. Oral presentations were scheduled for October 4 and 5, 1989. But the PADC eventually began to doubt the wisdom of treating each applicant's financing proposals as part of his overall package. By unbundling the financing from the development competition, the government could combine the best design and development with the thriftiest financing arrangements. Accordingly, on September 29, 1989, the PADC sent letters notifying all the applicants that it might uncouple the two aspects by deleting the financing criterion from the development competition. It invited each applicant to address the matter in its oral presentation and to explain the impact, if any, on the applicant's development proposal. J.A. 773.

Saratoga voiced no opposition to deleting the financing criterion and did not suggest that deletion would have any effect on its development proposal. See J.A. 774 (letter from Saratoga's partner responding to PADC's September 29 notification); J.A. 948–50 (transcript of Saratoga's responses to questions at oral presentation). But Saratoga now contends that the PADC's eventual decision to delete the criterion—a decision formally made on October 18, 1989, only minutes before the corporation voted which applicant to select—violated federal procurement law because the PADC gave the applicants no time to alter their proposals in response.

At the same time as it deleted the financing criterion, the PADC's Board of Directors adopted a resolution calling upon the winning developer to make good-faith efforts to include minorities and women from the losing development teams. J.A. 1066. Saratoga suggests that the effect of this resolution was to downgrade the importance of the affirmative-action criterion; on this theory, Board members might have voted for a development team with a mediocre affirmative-action plan in the expectation that the team would be able to raid the groups assembled by its competitors. Again, Saratoga claims that the last-minute decision constituted an illegal modification of the selection criteria.

Saratoga asserts several other possible illegalities. For instance, Saratoga complains that the PADC offered no explanation for its decision to select the Delta Partnership as the winning developer. Saratoga also raises questions about the completeness of the administrative record and contends that the district court erroneously cut off discovery by granting summary judgment.

## II. Alleged Violations of Procurement Law

■ The Federal Acquisition Regulations system ("FAR"), collected in title 48 of the Code of Federal Regulations, applies to wholly owned government corporations like the PADC. See 48 CFR § 2.101 (defining "executive agency" to include "any wholly owned Government corporation within the meaning of 31 U.S.C. § 9101"); 31 U.S.C. § 9101(3)(H) (defining "wholly owned Government corporation" to include PADC). For most "negotiated" contracts—that is, contracts awarded without using sealed bidding procedures, cf. 48 CFR § 6.401(a)(3)—the FAR requires an agency's contracting officer to solicit bids through a written "request for proposals" ("RFP"). See id. § 15.402. Agencies can amend RFPs once they are issued, but amendments sometimes require the agency to extend the deadline for proposals. See id. §§ 15.410(a), 15.606.[1] According to the FAR, "The contracting officer shall not award a contract unless any amendments made to an RFP have been issued in sufficient time to be considered by prospective offerors." Id. § 15.410(b). This provision apparently applies to negotiated construction contracts no less than to other sorts of negotiated contracts. See id. § 36.101.

The district court concluded that the PADC's selection criteria were the "functional equivalent" of an RFP, and that the PADC's last-minute deletion of the financing criterion and adoption of the affirmative-action resolution violated § 15.410(b) because "no entrant had the time or opportunity to consider these amendments to the selection criteria before the contract was awarded." 777 F.Supp. at 38. In addition, the district court hinted that the PADC's last-minute actions also violated the Competition in Contracting Act of 1984 ("CICA"), Pub.L. No. 98–369, 98 Stat. 1175 (codified at 41 U.S.C. §§ 253 et seq.), whose procurement procedures apply to wholly owned government corporations by virtue of 40 U.S.C. § 472(a). See 777 F.Supp. at 37–38. The court granted summary judgment for the government only because it concluded that these violations did not prejudice Saratoga. Id. at 37–39 (citing Kentron Hawaii Ltd. v. Warner, 480 F.2d 1166 (D.C.Cir.1973)).

We do not believe that the PADC's process for selecting the Federal Triangle developer was governed by the FAR and the CICA at all. Congress stipulated that the competition for this project "shall be conducted in accordance with the existing policies and procedures of the Corporation for a development competition", 40 U.S.C. § 1104(a)(3) (emphasis added), which we understand to refer to the only procedures the PADC ever characterized as procedures for a "development competition"—namely, those used for private development initiated by the PADC. See Development Policies and Procedures at iii (indicating that PADC's procedures for "development competitions" applied only to "permanent private development activity in the area under the jurisdiction of the Corporation", not to "new development undertaken by the Corporation itself").

■ The district court assumed that the PADC's existing procedures for a "development competition" had to include compliance with the FAR and the CICA. 777 F.Supp. at 37 n. 4; see also J.A. 1074 (GAO letter making same argument). But this simply is not true. To be sure, the PADC—as a wholly owned government corporation—is subject to those authorities. But the FAR applies only to "acquisitions", defined as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease. . . ." 48 CFR §§ 1.103, 2.101. Likewise, the CICA applies only to government "procurements".[2]

---

1. Indeed, if a change "is so substantial that it warrants complete revision of a solicitation", the agency must "cancel the original solicitation and issue a new one, regardless of the stage of the acquisition". Id. § 15.606(b)(4).

2. The CICA itself does not define "procurement", though a related statute uses the term to refer to "the process of acquiring property or services".

41 U.S.C. § 403(2). The Fifth Circuit recently refused to import this definition into the CICA, but only because it considered the CICA's use of the term considerably narrower than this definition might suggest. See Rapides Regional Medical Center v. Secretary, Dep't of Veterans' Affairs, 974 F.2d 565, 573 (5th Cir.1992).

These words describe what the PADC does when it acts as a developer in its own right, choosing contractors to construct public parks and the like. But when the PADC conducted "development competitions" to select developers for projects like Market Square and the Lansburgh, it was not "acquiring" or "procuring" anything; far from expending public funds to purchase public property, the PADC was simply offering developers the right to spend their *own* funds on *private* projects. The laws and regulations guiding government construction contracts had no bearing on those procedures.

■ Nor did the PADC follow the CICA and the FAR voluntarily in conducting its "development competitions". As the government explained in its brief below,

> PADC follows the CICA and FAR when it uses appropriated funds to construct parks or other public improvements or obtain professional services. However, PADC never has followed the CICA and FAR in any of its previous four development competitions where property for private development (with private funds) is offered through sale or lease. Instead, PADC has followed its own policies and procedures in development competitions.

J.A. 316 n. 11.

■ Saratoga insists, however, that when Congress directed the PADC to use its existing procedures for a "development competition" to select the Triangle Project's developer, it intended not to *supplant* the CICA and the FAR but rather to impose an *additional* requirement: Congress wanted the PADC to follow not only the CICA and the FAR, but also its own procedures for "development competitions". Yet the CICA itself seems to rule out this position. In a savings clause, the CICA specifies that its competition requirements do not apply "in the case of procurement procedures otherwise expressly authorized by statute". 41 U.S.C. § 253(a). In the Federal Triangle Development Act of 1987, Congress not only authorized but directed the PADC to follow its own "Policy and Procedures Regarding Development

Competitions". As for the relevant provisions of the FAR, Saratoga asserts that they implement the CICA, see Appellant's Reply Brief at 4, and so they would apply here only if the CICA did. Cf. *Koh Systems, Inc.*, 88–2 BCA (CCH) ¶ 20,664.

■ The context in which Congress acted fortifies our conclusion that Congress intended 40 U.S.C. § 1104(a)(3) to supplant the CICA and the FAR. The Federal Triangle project was something of a hybrid. Though it was publicly funded in the sense that the government would eventually pay all the development costs in the form of "rent", title to the building could actually be in private hands for the first 35 years.[3] Indeed, the prime mover behind the legislation assured his colleagues that "[i]t will cost no Federal funds to build"—apparently because the building will house several federal agencies that are currently paying rent elsewhere, and this consolidation was projected (apparently unrealistically) to *save* significantly more money than the Federal Triangle project would cost. See 133 Cong.Rec. S22,021 (Aug. 3, 1987) (remarks of Sen. Moynihan). Most significantly, rather than treating the project as a normal federal office building to be constructed by the GSA or the GSA's contractors, Congress entrusted it to the care of a corporation whose primary success had come in superintending private projects. As a result of this mixture of private and public elements, Congress could rationally have instructed the PADC to use *either* of two possible sets of procedures: Set *A*, applicable to the selection of contractors for *public* projects, or Set *B*, applicable to the selection of developers for *private* projects. Yet there was no overlap between Set *A* and Set *B*; that is, the PADC had never followed its rules for a "development competition" when acting subject to the CICA and the FAR, and it had never followed the CICA and the FAR when conducting a "development competition". In this context, we decline to hold that when Congress told the PADC to use

---

**3.** This arrangement may have been modeled on a 1972 statute that permitted the GSA to enter into such "lease purchase contracts", albeit not for

quite such a long term. See 40 U.S.C. § 602a. This authority lapsed in 1975. *Id.* § 602a(g).

Set *B*, it really meant that the PADC should use *both* sets.[4]

We note that in several respects the FAR is actively in tension with the PADC's procedures for a "development competition". For instance, the PADC's procedures call for the corporation to reject all submissions that "do not comply with the mandatory requirements of the prospectus". J.A. 465. Under the FAR, however, a proposal can be within the "competitive range"—the collection of "all proposals that have a reasonable chance of being selected for award", 48 CFR § 15.609(a)—even though it contains a "deficiency", defined as something "that fails to satisfy the Government's requirements", see *id.* § 15.601. Far from rejecting such submissions, the contracting officer generally is supposed to alert the offerors to any deficiencies so that they have "an opportunity to satisfy the Government's requirements." *Id.* § 15.610(c)(2).

Quite apart from such specific tensions, the general tenor of the PADC's procedures is far less rigid and bureaucratic than that of the FAR. Chapter 1 of the FAR, which sets forth the basic government-wide acquisition regulations, occupies nearly 1500 densely printed pages in the Code of Federal Regulations; the PADC's "Policy and Procedures Regarding Development Competitions" are set out in five typewritten sheets. The FAR requires construction solicitations to be issued on "Standard Form 1442, Solicitation, Offer, and Award (Construction, Alteration, or Repair)", 48 CFR §§ 36.701(b), 53.301–1442; the solicitation must include a variety of boilerplate provisions, see, e.g., *id.* §§ 15.407 & 22.407,[5] and is structured in such a way that the government forms a binding contract simply by accepting a responsive proposal. See *id.* § 15.402(d); cf. *id.* § 15.611(c). By contrast, the PADC's procedures for a "development competition" simply call on the Corporation to issue a "prospectus" that describes the Corporation's "selection criteria"; the PADC's selection of the winning developer does not itself form a contract, but only launches a period of "exclusive negotiations" in which the parties attempt to arrive at a formal agreement. J.A. 464–67.

More generally, Congress's entire scheme for the Federal Triangle project represented a rejection of normal procurement processes. This rejection started with Congress's decision to entrust the project to the PADC, for the default statute says that "[n]o public building shall be constructed except by the [GSA] Administrator". 40 U.S.C. § 601. Similarly, the GSA ordinarily is barred from entering into leases that bind the government for longer than 20 years. *Id.* § 490(h); 48 CFR § 570.103. Accordingly, when Congress wanted the normal rules to apply to the Federal Triangle project, it specifically said so, as in its requirement that the project meet the construction standards applicable to federal buildings. *Id.* § 1104(d).

■ For these reasons, we conclude that 40 U.S.C. § 1104(a)(3) supplanted the FAR and the CICA, and that those authorities did not govern the PADC's selection of the Federal Triangle developer. We also reject Saratoga's argument that the GSA's execution of a lease with the winning developer violated 40 U.S.C. § 618(b), which provides that the GSA "may acquire a leasehold interest in any building which is constructed for lease to, and for predominant use by, the United

---

4. Saratoga contends that at least in the early phases of the Federal Triangle project, the PADC seemed to think that it was bound by the FAR. We are not sure why this would matter, but in any event Saratoga's principal evidence for this contention is that the PADC followed the FAR when it arranged for an outside contractor to help it evaluate developers' applications. This proves nothing: even when the PADC conducted its customary "development competitions" (that is, competitions for the right to develop *private* projects), its contracts for professional services were "acquisitions" subject to the FAR and the CICA. See J.A. 316 n. 11 (acknowledging that PADC is bound by CICA and FAR "when it uses appropriated funds to ... obtain professional services"). See also *infra* at 454 n. 5.

5. These requirements constitute further refutation of Saratoga's assertion, see *supra* at 454 n. 4, that the PADC initially considered the FAR applicable to the Federal Triangle project. The PADC's prospectus was not attached to the required form and did not contain the specified language. Indeed, even the district court found only that the PADC's published selection criteria constituted the "functional equivalent" of the Request for Proposals contemplated by the FAR. 777 F.Supp. at 38.

States only by the use of competitive procedures required by [CICA]". Just as Congress overrode the FAR and the CICA when it enacted § 1104(a)(3), it obviously overrode § 618(b) when it directed the GSA to enter into a lease with whichever developer won the PADC's "development competition". 40 U.S.C. § 1105.

### III.  Alleged Violation of the PADC's Own Procedures

■  Saratoga falls back on the claim that the PADC violated its own policies and procedures. According to Saratoga, the PADC was obliged to hold an "open period" during which the offerors could modify their proposals in response to the PADC's deletion of the financing criterion and its adoption of the affirmative-action resolution. Appellant's Reply Brief at 6 n. 8.

Saratoga is referring to the following section of the PADC's procedures:

Modifications of or additions to timely submissions will not be permitted except in the case of clerical errors in the original submission, requests by the Corporation for further information, *or in cases where the Corporation sets an open period during which all developers are allowed to submit modifications.*

J.A. 465 (emphasis added). On its face, however, this section simply *describes* an "open period", and does not oblige the PADC to hold one.

■  Even if the PADC would face such an obligation in some circumstances, the PADC here specifically asked each developer—both by letter and in the oral presentation—whether deletion of the financing criterion would have any impact on its proposal. Neither Saratoga nor any other development team identified any such impact. Indeed, at the oral presentation, Saratoga's partner acknowledged the PADC's complete right to delete the financing criterion, and Saratoga never indicated that it would need to modify its proposal if the PADC chose to exercise this right. See J.A. 948. Even now, Saratoga offers only contradictory and ill-supported

claims of how it would have changed its application in response to the deletion of the financing criterion. Sometimes, Saratoga asserts (without offering any details) that its financing plan unduly constrained its design and project budget, crimping its ability to compete with the other entrants. See, e.g., Appellant's Opening Brief at 24–25. At other times, however, Saratoga suggests that its financing proposals were so good that they would have given it a clear leg up on the competition. See, e.g., *id.* at 5–7. Assuming without deciding there might be some judicial review of the PADC's possible abuse of discretion in not holding an "open period", this record completely fails to suggest such abuse.

■  The PADC's affirmative-action resolution, for its part, did not alter the selection criteria at all; indeed, it merely directed the winning developer to do something that it had already been free to do on its own. The district court, without finding any special facts to support this inference, concluded that the resolution probably did decrease the *weight* that the PADC's directors assigned to the affirmative-action criterion. 777 F.Supp. at 38. But the PADC's prospectus never specified *any* weights for the various criteria; to the contrary, it indicated that the PADC retained sole discretion over the weight of each one. See J.A. 452/1.[6] It is hard to imagine, then, that any entrant would have kicked people off its development team or otherwise altered its approach in response to the resolution. In any event, given the discretionary nature of the PADC's decision whether to hold an "open period", we decline to hold that the PADC violated its own procedures.

### IV.  Alleged Violations of the APA

#### A.  *Lack of Contemporaneous Explanation*

■  Saratoga also protests that the PADC gave no explanation of its decision to select Delta Partnership as the winning developer. Saratoga's analysis turns in part on language from the FAR, 48 CFR § 15.-612(d)(2), but as the FAR was inapplicable

---

**6.** If the CICA had applied, the PADC's solicitation would have had to state the relative importance assigned to each of the evaluation factors. See 41 U.S.C. § 253a(b)(1)(B).

we do not address its meaning. Saratoga also insists that the PADC's failure to provide a statement of reasons for its selection violated an implicit requirement of the Administrative Procedure Act ("APA"), and, indeed, of pre-APA administrative law. The basic theory is that the power of the courts to review agency action, see 5 U.S.C. § 706, implies that agencies must provide a contemporaneous explanation of actions subject to review, for "courts cannot exercise their duty of review unless they are advised of the considerations underlying the. action under review." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); cf. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

Without considering whether the principle has quite so broad a scope as plaintiff suggests, we find no violation here. It is true that the PADC's only official explanation for its decision to select the Delta Partnership over the six other bidders was that Delta had won a majority of the ballots cast by the PADC's directors. (Of the thirteen votes cast, Delta received seven, four more than its next closest competitor, and Saratoga received none. J.A. 1060–62.) But in light of the final report of the PADC staff evaluating the various proposals, submitted one day before the final vote, we think that as between Saratoga and Delta we can discern the reasons for Delta's victory.[7] See *Bowman Transp. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); cf. *Development Policies and Procedures* at 23, J.A. 466 ("The Board of Directors shall consider the selection of a developer after hearing a final staff analysis....").

To judge from the staff report, Saratoga's proposal enjoyed one advantage over Delta's: the PADC's staff estimated that it would cost $26.3 million less to execute. J.A. 1029. Saratoga's smaller price tag, however, evidently came at quite a sacrifice of other values. Though the staff did not rank proposals or make any recommendations, it vigorously criticized Saratoga's design plans, speaking of "disjointed and confusing" elements, "unusable" open space, and "awkward" and "[un]convincing[ ]" architecture. J.A. 1023; cf. J.A. 1022 (praising Delta's design). The staff also commented that all but one of Saratoga's principals "have limited or no experience developing complex, mixed-use projects in dense, downtown settings"; the staff concluded that Saratoga "does not have the development experience that other teams possess", J.A. 1025, and that "[t]he performance capability of this development team for this project is questionable", J.A. 1028. Cf. J.A. 1024, 1027 (praising experience and capability of Delta's development team).

In this context, the PADC's vote effectively announced that in the judgment of the majority of the voting directors, the superior aesthetic and functional features of Delta's design (coupled with the superior experience and proven capability of Delta's principals) were worth the extra $26.3 million that Delta's proposal would cost. It is precisely this sort of subjective judgment that Congress entrusted to the PADC—not the courts.

■■■ Even conventional procurement matters are normally so discretionary that the disappointed bidder bears a "heavy burden" of showing that the award decision "had no rational basis". *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); see also *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971). "[J]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions....'" *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 203 (D.C.Cir.1984) (quoting *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978)). The special statutory scheme involved in this case, and the largely aesthetic nature of the trade-offs required, only accentuate the limits on our role. It would therefore be senseless to insist upon a detailed explanation of the PADC's decision to select Delta over Saratoga. Even if that decision was not "committed to [the PADC's] discretion by law", see 5

---

7. This case, of course, does not call upon us to address whether the PADC's reasons for selecting

Delta over other bidders are equally discernible.

U.S.C. § 701(a)(2), the current administrative record gives us ample information to review, and to affirm, the PADC's judgment.

### B. *Failure to Present the "Whole Record"*

■ Saratoga also protests that the PADC did not present the "whole record" to the district court for review. Cf. 5 U.S.C. § 702; *Overton Park*, 401 U.S. at 419–20, 91 S.Ct. at 825. By statute, the PADC was required to consult with the GSA and with the International Cultural and Trade Center Commission (which represented the prospective tenants of the Federal Triangle building) before selecting the winning developer. 40 U.S.C. § 1104(a)(2). Both the GSA and the Commission had technical reports prepared on the various proposals to enable them to perform their advisory roles. Saratoga infers that these reports contained some criticisms of Delta's proposal, because the GSA and the Commission both decided to recommend BPT Properties as the winning developer. The administrative record, however, does not contain these reports. Nor does it contain the report prepared by the District of Columbia government, which gave Saratoga and BPT its highest rating and put Delta into the next tier. J.A. 241. On the basis of these facts, Saratoga suggests that the PADC has "skew[ed] the record to exclude information from its own files that is pertinent and integral to the process by which the decision was reached." Appellant's Opening Brief at 39.

There appears no support for this claim of a rigged record. The administrative record in fact contains the GSA's letter recommending BPT to the PADC, see A.R. tab 36; nothing obliged the GSA to transmit the underlying technical reports to the PADC, and the government assures us that it never did so. As for the Commission, the administrative record contains both its recommendation of BPT and its descriptive evaluation reports, see A.R. tab 37; again, the PADC evidently never saw the technical reports. Nor did the D.C. government send its report

to the PADC. See Federal Appellees' Brief at 42–43. In sum, the PADC did not exclude these reports from the record that it gave to the district court, for the simple reason that they were never part of the record in the first place; they were neither prepared for nor provided to the PADC[8] or its staff.

■ Saratoga counters that if the PADC did not consider these materials, its decision may well have been arbitrary. Appellant's Opening Brief at 39. This is a complete non sequitur. Over the course of the four months between the deadline for submissions and the selection of the winning developer, the PADC's staff pored over the proposals with the help of specially retained experts, and then submitted its evaluations to the Corporation. The possibility that the PADC might have chosen another developer if it had been relying on, say, the GSA's staff instead of its own surely does not make its decision arbitrary; Congress entrusted the ultimate selection decision to the PADC, not the GSA.

### V. Discovery

■ After filing its complaint in the district court, but before the administrative record was transmitted to the court, Saratoga sought extensive discovery from the appellees. The government responded by asking the district court to deny all discovery. The court eventually granted summary judgment for the government without ruling on the pending discovery motions. Saratoga suggests that discovery was in fact necessary and that the district court's grant of summary judgment was therefore premature.

■ Saratoga does not dispute the government's contention that "it wants discovery to probe the mental processes of the decision-makers". Federal Appellees' Brief at 43. Indeed, Saratoga acknowledges that it seeks to examine such matters as "why each Board member who voted for Delta did so". Appellant's Opening Brief at 43 n. 24. But

---

8. The GSA Administrator was a director of the PADC, and there was some overlap between the PADC and the Commission. The mayor and council chairman of the District of Columbia also sat on the PADC's board. But even if these people (in their non-PADC capacities) saw the reports prepared for their respective groups, Saratoga does not argue that these facts have any bearing on whether the reports should have been included in the administrative record.

such discovery is permissible in only two circumstances: when it "provides the only possibility for effective judicial review and ... there have been no contemporaneous administrative findings" (so that without discovery the administrative record is inadequate for review), and when "there has been a strong showing of bad faith or improper behavior" (so that without discovery the administrative record cannot be trusted). *Community for Creative Non–Violence v. Lujan,* 908 F.2d 992, 997 (D.C.Cir.1990); *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825; see also *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). We have already rejected Saratoga's efforts to fit this case within the first exception. The second exception is no more applicable.

■ According to Saratoga, there are "abundant indications" that the PADC's selection of Delta resulted from "improper behavior". Appellant's Opening Brief at 42. But to support this theory Saratoga relies principally on its claims of "deliberate [PADC] violation of procurement law", *id.,* claims we have already rejected.

Beyond that, Saratoga points to the fact that Delta—the developer chosen by the PADC—gave a higher estimate of its project costs than any other entrant. In contrast to Saratoga's bid of $556 million, Delta predicted that its design would cost $746 million; even after the PADC's staff decided that Delta's proposal actually would cost only $665 million, and that Saratoga's proposal would cost $638 million, Delta's design still was 4 percent more expensive than Saratoga's. See J.A. 1029. But it was up to the PADC to decide whether the extra cost was worth it. In hindsight, the staff's downward revision of Delta's cost estimates appears overoptimistic—see, e.g., David S. Hilzenrath, "Ballooning Costs Delay Federal Triangle Project", *Washington Post* (July 19, 1990), at J.A. 366—but that hardly supports an inference of improper influence.

■ Saratoga also asserts that Delta—alone among the entrants in the development competition—did not address either the financing or the affirmative-action criterion in its oral presentation to the PADC on October 4, despite the fact that the PADC's procedures called upon each developer "to address *all* of the issues suggested by the selection criteria in the prospectus". See J.A. 465 (emphasis added). Saratoga speculates that Delta may have had inside information about the PADC's intentions, and that it benefited from this information by concentrating its oral presentation on the criteria that the PADC really cared about.

This claim is wrong in every detectable dimension. First, Delta *did* address both the financing and affirmative-action issues. See J.A. 789–90, 854–56, 882–86. Second, Delta's decision to direct attention elsewhere can easily be explained without leaping to suppositions of chicanery. The PADC's letter had indicated that financing might well be unbundled from the general competition; in addition, since the competitors were free to accompany their oral presentation with slides, Delta may have felt that the oral presentation was its chance to highlight its design. Others besides Delta scanted both financing and affirmative action, suggesting (unless we widen the imagined conspiracy) that Delta's strategy sprang simply from an exercise of normal intelligence.

In sum, we find no error in the district court's failure to order the requested discovery. Saratoga simply has not made the "strong showing" of corrupt decisionmaking necessary to justify court-sanctioned probing of the administrative process.

The judgment of the district court is

*Affirmed.*

WALD, Circuit Judge, dissenting:

The majority rules that the Competition in Contracting Act of 1984, 41 U.S.C. §§ 251 *et seq.* (1988) ("CICA"), which prescribes competitive procedures for procurement of property and services by executive agencies, and the Federal Acquisition Regulations ("FAR"), collected in Title 48 of the Code of Federal Regulations, which provide uniform policies and procedures for acquisitions by executive agencies, do not govern the selection of a developer for the Federal Triangle Project, a federal office building and international and cultural trade center that will ultimately be financed with public funds. The

majority also rules that it was not necessary for the PADC to offer any explanation for its choice of a developer for this over-$650 million project. I believe that Congress intended for CICA and FAR to apply to the selection of a developer for the Federal Triangle Project and that the PADC was required to give some explanation for its decision. However, since I also agree with the district court that Saratoga was not prejudiced by any violation of CICA and FAR, I would affirm its decision in large part, remanding only to require the PADC to provide the missing rationale for its decision.

## I. APPLICABILITY OF CICA AND FAR

As a wholly-owned government corporation, the PADC qualifies as an executive agency that is presumptively subject to CICA whenever it makes purchases or contracts for property or services. *See* 41 U.S.C. § 252(a) (1988); *see also* 40 U.S.C. § 472(a) (1988) ("executive agency" includes any wholly-owned government corporation). FAR also applies to the PADC whenever it makes an "acquisition," defined as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated." 48 C.F.R. § 2.101 (1993); *see also* 48 C.F.R. § 1.103 (1993). Because the private developer selected to construct the Federal Triangle Project will be fully reimbursed with GSA funds, and because the federal government will own the building after an up-to-35–year lease, the selection of a developer for the Project clearly constitutes both a "purchase or contract for property or services" within the meaning of CICA and an "acquisition" within the meaning of FAR. Moreover, the Federal Triangle Development Act, 40 U.S.C. §§ 1101 *et seq.* (1988) ("FTDA"), contains no explicit indicia of a congressional intent to exempt the Federal Triangle Project from the requirements of CICA or FAR. *Cf.* Statute of Liberty–Ellis Island Commemorative Coin Act, Title I, Pub.L. No. 99–61, § 107, 99 Stat. 113 (1985) ("No provision of law governing procurement or public contracts shall be applicable to the procurement of goods or services necessary for carrying out the provisions of this title."); 39 U.S.C. § 410(a) (1988) ("no Federal law dealing with public or Federal contracts, [or] property ... shall apply to the exercise of the powers of the Postal Service"). Due to the absence of such an express disclaimer, the FTDA lacks a clear statement of congressional intent to allow the PADC to select the developer for the Federal Triangle Project without regard to the strictures of CICA and FAR.

Contrary to my colleagues, I believe, along with the district court, that § 1104(a)(3) of the FTDA, which instructs the PADC to select a developer for the Federal Triangle Project "in accordance with the existing policies and procedures of the Corporation for a development competition," 40 U.S.C. § 1104(a)(3), does not evidence any congressional intent to exempt the PADC from the requirements of CICA or FAR. *See Saratoga*, 777 F.Supp. at 37 n. 4. Nor do the PADC's policies and procedures for conducting a development competition themselves explicitly preclude compliance with CICA or FAR. The majority relies heavily on the fact that, prior to the enactment of the FTDA, the PADC had conducted four "development competitions" for *privately*-funded projects without complying with CICA or FAR. Due to the absence of any appropriated funds in these development competitions, the PADC considered itself exempt from the constraints of the federal procurement laws and regulations. However, the PADC does uniformly comply with CICA and FAR whenever it conducts sealed-bid competitions to select contractors for *publicly*-funded projects. Based on this information, the majority concludes that § 1104(a)(3)'s use of the phrase "development competition" demonstrates a congressional intent for the PADC to comply solely with its procedures for privately-funded projects, and to ignore entirely the requirements for publicly-funded endeavors.

A more logical reading of congressional intent, however, is that Congress must have assumed that while the PADC's development policies and procedures do not require that a "development competition" comply with CICA and FAR when only private funds are

involved, CICA and FAR would apply to a hybrid situation such as this one—where a private developer will be eventually reimbursed through the use of public funds. My reading of congressional intent to cover the Federal Triangle Project in federal procurement law is compelled in part by the enormity of the Federal Triangle Project, both in terms of public resources and physical presence. The Federal Triangle Project, billed as second in size only to the Pentagon, will consume $665 million of the public fisc, at the very least. The grandeur of the project buttresses the presumption that Congress intended that its development would comply with at least the basic principles of federal procurement law, rather than merely five typewritten pages of the PADC's procedures. In sum, I think the evidence plainly demonstrates that Congress intended CICA, FAR, *and* the PADC's procedures to apply to the selection of a developer for the Federal Triangle Project.[1]

Nor do I agree with the majority that § 1104(a)(3) falls within the "savings clause" of CICA, which provides that

> except in the case of procurement procedures *otherwise expressly authorized by statute,* an executive agency in conducting a procurement for property or services— (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title.

41 U.S.C. § 253(a)(1) (1988) (emphasis added). The majority reads this provision to mean that whenever Congress specifies *any* procurement procedures for an executive agency in a separate statute, it automatically exempts the agency altogether from compliance with CICA. For CICA's full and open competition requirements to govern the agency's actions in such a case, Congress would always have to reiterate in the separate statute that CICA applies. The majority's interpretation, however, threatens to severely undermine CICA's statutory scheme, which presumptively applies to all executive agencies, by forcing Congress to restate af-

firmatively CICA's application on a statute-by-statute basis whenever it mentions any additional special requirements. I cannot subscribe to so broad a reading of CICA's exemption clause, which cuts against the statutory grain. Section 253 of CICA sets up a general scheme under which all executive agencies "shall" use competitive procedures (either by soliciting sealed bids or requesting competitive proposals), unless the project falls into an exclusive set of narrowly-drawn situations in which the agency "may" rely on "procedures other than competitive procedures." 41 U.S.C. § 253(c); *see also* 41 U.S.C. § 253(f) (requiring detailed justification for use of noncompetitive procedures). Thus CICA's statutory framework underscores Congress' view that competitive procedures in the federal procurement sphere are a crucial ingredient in meeting the goal of economizing the vast amount of public resources expended every year by federal agencies when purchasing and contracting for property and services. Conscious of prior noncompetitive practices by executive agencies that were detrimental both to competitors and the public alike, *see* H.R.Rep. No. 861, 98th Cong., 2d Sess. at 1428 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 2116, Congress created a presumption of reliance on competitive procedures that would promote "full and open" competition in federal procurement. *See* 41 U.S.C. §§ 253(a) & (f).

Assuredly, § 253(a) says that Congress may expressly authorize procurement procedures that provide otherwise, but in the context of Congress' clearly-stated objective of ensuring that executive agencies adhere to competitive procedures whenever possible, and indeed its focus on restricting CICA's own exceptions for noncompetitive procedures, *see generally* H.R.Rep. No. 861, 98th Cong., 2d Sess. 1421–28 (1984), U.S.Code Cong. & Admin.News 1984, pp. 2109–2116, I think that the language of § 253(a) indicates that Congress deliberately limited the savings clause to situations in which Congress

---

**1.** To repeat the relatively simplistic analogy of the majority, because the Federal Triangle Project involves both *public* funds (normally associated with Set A of procedures) and a *private*

development competition (normally associated with Set B of procedures), Congress expected the PADC to use both Set A *and* Set B of procedures. *Cf.* Majority opinion ("Maj. op.") at 454.

"expressly authorized" an agency to ignore CICA's requirements. Such "express authorization" can take the form of either an explicit statement repudiating CICA, or the prescription of procedures which by their nature are in marked contradiction to CICA. To me, the use of the word "otherwise" in conjunction with the phrase "expressly authorized" highlights this notion of conflict, suggesting that, for the exemption to apply, the procurement procedures sanctioned by the non-CICA statute must be contrary to CICA's requirements. CICA's legislative history certainly seems to indicate a congressional intent to limit the application of the savings clause to instances in which the "procurement procedures otherwise expressly authorized by statute" conflict with CICA. The Conference Report on CICA, which recommended the actual language of § 253(a)(1), described the substantively indistinguishable precursor to the savings clause[2] as follows: "Agencies are required ... to use competitive procedures ... unless a statutory exception allowing the use of *noncompetitive* procedures is met." H.R.Rep. No. 861, 98th Cong., 2d Sess. at 1421 (1984), U.S.Code Cong. & Admin.News 1984, p. 2109 (emphasis added). The legislative history appears thus to demonstrate an intent to excuse an executive agency from the requirements of CICA only where it or another statute has authorized the use of *noncompetitive* procurement procedures, which by their nature *conflict* with CICA's presumption of full and open competition.[3] Congress sought to exempt agencies from the burden of complying with CICA only where compliance would be incompatible with the nature of the operation or when Congress itself expressly stated that CICA did not apply. It did not, however, intend to create a loophole such as the majority envisions, whereby an executive agency can avoid the constraints of CICA whenever Congress affirms the agency's own procurement procedures, even when the agency's procedures are entirely compatible with CICA's requirements. My view that, absent conflict or an express exemption from CICA, both CICA's and the PADC's procedures apply, also coincides with the basic principle of statutory construction that "[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *see also Smith v. Robinson*, 468 U.S. 992, 1024, 104 S.Ct. 3457, 3474, 82 L.Ed.2d 746 (1984) (Brennan, J., dissenting) ("conflicting statutes should be interpreted so as to give effect to each but to allow a later enacted, more specific statute to amend an earlier, more general statute only to the extent of the repugnancy between the two statutes"). The FTDA certainly does not "clearly express" an intent to exempt the PADC from CICA.

The PADC's procedures are competitive and complement, rather than conflict with, CICA. Indeed, because they are specifically fashioned with an eye toward the PADC's specific internal structure, the PADC's procedures provide something that CICA does

---

2. The precursor to the savings clause, found in S. 338, stated that *"[e]xcept as ... otherwise provided by law,* executive agencies shall use competitive procedures in making contracts for property and services."* S.Rep. No. 50, 98th Cong., 1st Sess. at 42 (1983) (emphasis added). Although the language of § 253(a)(1) is more explicit than this provision, specifically mentioning "procurement procedures otherwise expressly authorized by statute," it differs in no material respect for purposes of analysis.

3. Drawing a line between procurement procedures that conflict with CICA and those that do not is consistent with *Rapides Regional Medical Center v. Department of Veterans' Affairs,* 974 F.2d 565 (5th Cir.1992), the only case to interpret the savings clause. In *Rapides,* the court used the prism of congressional intent to examine whether the savings clause excused "sharing arrangements" for expensive medical equipment for the Veterans' Administration from the competitive procurement requirements of CICA. In concluding that CICA did not apply, the court contrasted Congress' intent to base reimbursement for the sharing arrangements " 'on a methodology that provides appropriate flexibility to the heads of the facilities concerned,' taking into account 'local conditions and needs and the actual cost to the providing facility of the resource involved,' " with CICA's emphasis on ensuring a steady supply of materials and minimizing costs "without taking into account added considerations affecting private contractors." *Id.* at 574 (quoting 38 U.S.C. § 8153(b)).

not—they differentiate between the responsibilities of the Chairman, the Board, and the staff in conducting a development competition. *See, e.g.*, PADC DEVELOPMENT POLICIES AND PROCEDURES at 21–23 (Chairman decides when to initiate development competition, staff analyzes proposals, and Board chooses developer). In addition, the PADC's procedures impose specific obligations on the Corporation not found in CICA, such as preparing an environmental assessment for the prospectus and each development proposal, refraining from talking to one developer about another's proposal, compelling the Board to listen to a final PADC staff analysis prior to selecting a developer, and requiring that the developers make oral presentations and furnish the PADC with copies of all materials used in such presentations. While CICA only requires a solicitation of proposals to be designed so as to "achieve full and open competition for the procurement," 41 U.S.C. § 253a(a)(1) (1988), the PADC's procedures specify that the PADC must conduct a *nationwide* effort to inform and interest developers so as to assure high quality proposals. On the other hand, CICA contains the general requirements for planning a solicitation, soliciting bids, evaluating proposals, discussions with offerors, and written notification of the award. On the whole, therefore, CICA's and the PADC's procedures are supplementary.

Finally, I disagree with the majority that there are inherent conflicts between the PADC's procedures and FAR that excuse the PADC from complying with FAR when selecting a developer. FAR applies to all acquisitions "except where expressly excluded." 48 C.F.R. § 1.103 (1993). Section 1104(a)(3) certainly does not *expressly* exempt the Federal Triangle Project from the requirements of FAR. Moreover, I fail to see any irreconcilable conflicts between FAR and the PADC's procedures. For example, it is not impossible for the PADC to reject any proposals "that do not comply with the mandatory requirements of the prospectus," PADC DEVELOPMENT POLICIES AND PROCEDURES at 22, and to comply with § 15.610(c)(2) of FAR, which requires the "contracting officer" to advise offerors of any deficiencies in their proposals during the oral or written discussion period. *See* 48 C.F.R. § 15.610(c)(2) (1993); *cf.* Maj. op. at 454. According to § 15.609(a) of FAR, a proposal does not even reach the discussion stage unless it is in the "competitive range," *i.e.*, it has a "reasonable chance of being selected for award." 48 C.F.R. § 15.609(a) (1993). Thus, under the PADC's procedures, any proposal that does not comply with the mandatory requirements of the prospectus will not be in the competitive range, and therefore FAR does not require the PADC to hold discussions with the developer to inform him of any deficiencies therein. Nor is there a conflict between the PADC's procedures' direction that exclusive contract negotiations must follow the selection of a developer of the Federal Triangle Project and § 15.402(d) of FAR, which states that "a proposal ... *can* be accepted by the Government to create a binding contract ... following negotiations." 48 C.F.R. § 15.402(d) (1993) (emphasis added); *cf.* Maj. op. at 454. Indeed, these provisions are entirely consistent. Finally, the majority's emphasis on FAR's "1500 densely printed pages" of "rigid and bureaucratic" procedures, Maj. op. at 454, is misleading. Only a narrow subset of these "densely printed" pages relate to competitive solicitations for negotiated acquisitions such as the one at issue here.

## II.  PREJUDICE TO SARATOGA

Assuming CICA and FAR apply to the Federal Triangle Project, the next question is whether Saratoga has borne the " 'heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.' " *Irvin Indus. Canada, Ltd. v. United States Air Force*, 924 F.2d 1068, 1072 (D.C.Cir.1990) (quoting, *inter alia*, *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973)); *see also Elcon Enterprises, Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C.Cir.1992). The district court agreed with Saratoga that the PADC's deletion of the financing criterion and the alleged modification of the affirmative action criteri-

on violated CICA and FAR. *Saratoga,* 777 F.Supp. at 38. CICA and FAR do not allow agencies to stray from the criteria provided to potential offerors in the prospectus. For example, CICA and FAR require executive agencies such as the PADC to evaluate competitive proposals "based solely on the factors specified in the solicitation," 41 U.S.C. § 253b(a) (1988), and to award contracts "to the responsible source whose proposal is most advantageous to the United States, considering only price and the other factors included in the solicitation." 41 U.S.C. § 253b(d)(4) (1988); *see also* 48 C.F.R. § 15.-608(a) (1993) (obligating agency to evaluate competitive proposals solely on factors specified in solicitation).

There is no doubt that the PADC did not base its selection decision on one of the eight factors specified in the prospectus—the financing criterion. It is less clear, however, whether CICA and FAR merely prohibit the PADC from basing its decision on *additional* factors not specified in the prospectus, or whether CICA and FAR require the PADC to consider *all* of the factors mentioned in the prospectus, unless the Corporation gives the bidders an opportunity to respond to a change in the factors. In any event, by eliminating the financing criterion without affording the offerors sufficient time to restructure their proposals in response to the change, the PADC certainly violated FAR, which provides that a "contracting officer shall not award a contract unless any amendments made to an RFP [request for proposal] have been issued in sufficient time to be considered by prospective offerors." 48 C.F.R. § 15.410(b) (1993); *see also* 48 C.F.R. § 15.606(b)(4) (1993) (if change in solicitation requirements is so substantial that it war-

rants complete revision of solicitation, contracting officer shall cancel original solicitation and issue new one). The deletion resolution was passed only minutes before the Board's final vote.

Deciding whether Saratoga suffered prejudice from the PADC's last-minute deletion of the financing criterion requires a determination of whether there is a reasonable possibility that Saratoga "would have altered its proposal to its competitive advantage had it been given the opportunity to respond to the altered requirements."[4] *IRT Corp.,* Comp. Gen.Dec. B–246991 (Apr. 22, 1992) 92–1 CPD ¶ 378 at 3; *see also Kentron Hawaii Ltd. v. Warner,* 480 F.2d at 1181 (D.C.Cir.1973) ("One complaining of procedural irregularity in the procurement process must first show that the alleged error at least potentially affected the substantive result."); *Chaffins Realty Co., Inc.,* Comp.Gen.Dec. B–247910.3 (June 8, 1993) 93–1 CPD ¶ 440 at 5 (where protestor was denied opportunity to submit a bid, protest was sustained because "the possibility that the protestor would have been in contention for [the] award [was] sufficiently high"); *Logitek, Inc.—Reconsideration,* Comp.Gen.Dec. B–238773.2, (Nov. 19, 1990) 90–2 CPD ¶ 401 at 2 (prejudice generally presumed unless protestor clearly would not have been successful offeror absent violation). In *Irvin Indus. Canada, Ltd. v. United States Air Force,* 924 F.2d 1068 (D.C.Cir. 1990), we found clear prejudice to the three losing offerors where the Air Force had given the winning bidder additional time to develop the product and had ignored material defects and deviations from the terms of the solicitation in the winning proposal, because it was "reasonably clear that another bidder, given the benefit of the similarly relaxed

**4.** Appellees suggest that Saratoga's claims of prejudice from the deletion of the financing criterion are barred by the company's failure to object to the deletion when the PADC first suggested that it was considering such a move. Saratoga convincingly responds that at the time of the September 29 letter, it did not object to the possible deletion of the financing criterion because the PADC plainly had the authority to eliminate the criterion. Saratoga's allegations of prejudice stem from the PADC's failure to give the developers time to alter their proposals in response to the change once it was adopted, not from the elimination itself. Because Saratoga

had no opportunity to object to the actual deletion of the financing criterion in the administrative proceedings, it did not waive its right to challenge this action. *Cf. United States v. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (requiring litigants to raise objections in first instance before administrative agency at time appropriate under agency's practice); *Salt Lake Community Action Program, Inc. v. Shalala,* 11 F.3d 1084, 1087 (D.C.Cir.1993) (objections to agency proceedings must be presented to agency to allow agency to make a factual record, exercise its discretion, or apply its expertise).

requirement ... would have bid in such a manner that it would have been in line for the award." *Id.* at 1074 n. 71 (citations omitted).

Saratoga cannot meet the "heavy burden" of·demonstrating prejudice. *See id.* at 1072. Although Saratoga contends that advance knowledge of the elimination of the financing criterion would have allowed it to spend more time discussing design in its oral presentation and to expand its budget for additional design features, neither of these claims suffices to show a real possibility that with foreknowledge, Saratoga would have altered its proposal sufficiently to enter the winner's circle. First, Saratoga's assertion that it wasted valuable time discussing financing during its oral presentation is insufficient to distinguish its plight from that of all the other bidders. Second, Saratoga's claim that with financing requirements out of the picture, it could have proposed a less cost-conscious design is similarly unpersuasive. Had Saratoga proposed a more· expensive design, it would have weakened its competitive position on the just as critical "project costs" criterion, which is quite independent of the "financial experience, resources, and commitment" criterion that was deleted. Finally, and even more important, the October 17, 1989 final PADC staff evaluation of the proposals gave Delta and Saratoga an identical rating on the financing criterion. J.A. at 1026. Thus in theory, these two bidders should have been equally affected by the elimination of this one criterion. And because all eight selection criteria were to be weighed equally, the relative ratings of bidders as to the remaining criteria stayed constant. In sum, even if Saratoga had been given its opportunity to respond to the deletion of the financing criterion, I can envision no scenario in which it would have made it into the winner's circle. The bottom line is that under the seven-factor rating system, Delta received seven votes in the competition, and Saratoga received none.

As a second bite at the apple, Saratoga seeks to enjoin the GSA Administrator from performing any of its obligations under its lease with Delta. Saratoga alleges that the GSA violated the Public Buildings Act of 1959, as amended in 1988, by entering into the thirty-year lease for the Federal Triangle building. *See* 40 U.S.C. §§ 601 *et seq.* (1988). The 1988 Amendments to the Public Buildings Act of 1959 provide that the GSA

> may acquire a leasehold interest in any building which is constructed for lease to, and for predominant use by, the United States *only* by the use of competitive procedures required by ... [CICA].

40 U.S.C. § 618(b) (1988) (emphasis added). Saratoga's challenge, however, essentially duplicates its challenge to the PADC's conduct of the Federal Triangle Project award competition and can be dismissed on the same grounds. Even assuming a violation of CICA, Saratoga suffered no prejudice. Therefore, Saratoga cannot obtain relief against the GSA any more than it can obtain relief against the PADC.

### III. CONTEMPORANEOUS STATEMENT OF REASONS

Finally, I disagree with the majority's finding that the PADC provided us with ample information to review its selection of Delta as the development team for the Federal Triangle Project. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *see also Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The October 18, 1989 resolution selecting Delta was printed on a one-page form with only one terse sentence pertaining to the selection process: "after several months of review and analysis, and after consultation with the International Cultural and Trade Center Commission, and the General Services Administration, the Board has completed its evaluation." J.A. at 1067. Although the majority relies on the PADC staff's final evaluation of the proposals to substantiate the Corporation's decision to select Delta, the October resolution nowhere incorporates this final evaluation so as to provide an easy reference point for the Board's decision. Just because the PADC's procedures require the PADC to listen to a final staff evaluation before selecting a developer, we cannot be sure that the Board made its decision on the basis of that evaluation. *Cf.* Maj. op. at 457. But even if the resolution had referenced the staff evaluations, these evaluations, which were prepared on the basis of the original eight crite-

ria, were, by the PADC's own admission, "analytical in nature, and did not rank the developers nor make any recommendation" for the ultimate award." J.A. at 113. While these same underlying staff evaluations did help to provide sufficient evidence to determine that Saratoga suffered no prejudice from the deletion of the financing criterion, I remain troubled by the PADC's failure to explain the standards on which *it* relied, how *its* conclusion was reached, or what factors influenced *its* decision. The staff evaluations cannot supply the missing links in the decisionmaking chain. Without some signals from the Board itself, we cannot know for sure that the Board did not ignore the staff reports altogether and base its award on extraneous or arbitrary factors.[5] Thus the PADC's fiat-like announcement of the award failed to provide an adequate basis for judicial review under the APA and crossed the critical line between being "tolerably terse" and "intolerably mute." *See Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1144 (D.C.Cir.1989) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)). Moreover, the October resolution violated FAR, which states that "[t]he supporting documentation prepared for the selection decision shall show the relative differences among proposals and their strengths, weaknesses, and risks in terms of the evaluation factors. The supporting documentation shall include the basis and reasons for the decision." 48 C.F.R. § 15.612(d)(2) (1993). Accordingly, I would remand to require the PADC to supplement the administrative record with an explanation of the reasons for its decision. *See Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. at 1244; *Overton Park*, 401 U.S. at 420–21, 91 S.Ct. at 826; *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337–38 (D.C.Cir.1989).

---

**5.** My uncertainty as to whether the Board considered the staff reports when voting is not in conflict with relying on the staff reports to aid the determination that Saratoga suffered no prejudice. The staff reports' equal ranking of Delta and Saratoga on the financing criterion is an objective indicator that no prejudice resulted from its deletion, regardless of whether the evaluation influenced the Board's decision to select Delta.