GRIGSBY BRANDFORD & CO., INC.

and

A.H. Williams & Co., Inc., Plaintiffs,

v.

UNITED STATES of America,

and

Richard W. Riley, Secretary of
Education, Defendants.

Civ. A. No. 94–2012.

United States District Court,
District of Columbia.

Nov. 28, 1994.

William McDaniels, Terrance O'Donnell and John Parry, Williams & Connolly, Washington, DC, for plaintiffs.

Bernadette Sargeant, Asst. U.S. Atty., Howard Sorensen, Office of the Gen. Counsel, Dept. of Educ., Washington, DC, for defendants.

### *MEMORANDUM—OPINION*

KESSLER, District Judge.

*I. Introduction and Procedural History*

Plaintiffs, joint venture partners Grigsby Brandford and Company, Inc. and A.H. Williams and Company, Inc. ("GB/AHW"), have brought the instant action challenging the Secretary of Education's selection of the firm of Pryor McClendon Counts & Co., Inc. ("PMC") as the Designated Bonding Authority ("DBA") for the Historically Black Colleges and Universities ("HBCU") Capital Financing Program. Plaintiffs claim that the Secretary's decision violates the Administrative Procedure Act ("APA") because it was arbitrary and capricious and an abuse of

discretion. Plaintiffs also allege that the decision, and the procedures by which it was ultimately reached, violated the Competition in Contracting Act ("CICA"), the Federal Acquisition Regulations ("FAR"), and the Federal Advisory Committee Act ("FACA").

On September 19, 1994, Plaintiffs filed Motions for a Temporary Restraining Order and a Preliminary Injunction precluding Defendants the United States of America and the Secretary of Education from implementing the September 2, 1994 selection of PMC as the DBA for the HBCU Capital Financing Program. In particular, Plaintiffs sought to enjoin the award of the Agreement to Insure to PMC, which is the contract actually establishing the DBA. Plaintiffs also requested an injunction requiring the selection of GB/AHW as the DBA and the award of the Agreement to Insure to GB/AHW, or, in the alternative, requiring a reconsideration and selection of the DBA among the three finalists, who were Plaintiffs, PMC, and M.R. Beal.

During a hearing before this Court on September 20, 1994, Defendants expressed their willingness to defer signing the Agreement to Insure, and, consequently, Plaintiffs withdrew their Motion for a Temporary Restraining Order without prejudice. On September 27, 1994, the parties submitted a joint briefing schedule, which set the Motion for Preliminary Injunction for hearing on October 31, 1994, and consolidated the hearing on the Preliminary Injunction with the final hearing on the merits of this case. This Court approved the parties' proposed schedule on October 4, 1994. On October 7, 1994, Defendants filed their Motion for Summary Judgment, and on October 17, 1994, Plaintiffs filed their Cross Motion for Summary Judgment. On October 31, 1994, counsel presented lengthy, and helpful, oral arguments. At that time, Defendants agreed that they would take no further action relating to the instant case until issuance of a decision on the pending Motions.

Accordingly, this matter is now before the Court upon Plaintiffs' Motion for Preliminary Injunction (2–2); Defendants' Motion for Summary Judgment (15–1); and Plaintiffs' Motion for Summary Judgment (27–1).

For the reasons stated below, Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment shall be **denied,** and Defendants' Motion for Summary Judgment shall be **granted.**

## II. Statement of Facts [1]

Congress enacted the HBCU Capital Financing Program in 1992 in recognition of the fact that "the Nation's historically Black colleges and universities have played a prominent role in American history and have an unparalleled record of fostering the development of African American youth." 20 U.S.C. § 1132c(2). The facilities of these institutions have, however, "suffered from neglect, deferred maintenance and are in need of capital improvements." 20 U.S.C. § 1132c(3). Congress also found that these institutions "often lack access to the sources of funding necessary to undertake the necessary capital improvements through borrowing and bond financing." 20 U.S.C., § 1132c(4). Congress determined that Federal assistance was needed to facilitate capital improvements and enable these institutions to "continue and expand their educational mission and enhance their role in American higher education." 20 U.S.C. § 1132c(6).

The HBCU Capital Financing Program creates a designated bonding authority (DBA), chosen by the Secretary, to issue bonds and lend the proceeds to eligible institutions for capital improvements projects. Repayment of the bonds will be backed by the full faith and credit of the United States. 20 U.S.C. § 1132c–2. Congress has allocated substantial power and responsibility to the DBA, clearly envisioning that the DBA will play the central role in the development and execution of the HBCU Capital Financing Program. 20 U.S.C. § 1132c–2(b).

In particular, the DBA will issue bonds and make loans to credit-worthy institutions.

---

1. Both Plaintiffs and Defendants filed cross-motions for Summary Judgment, including Statements of Material Fact pursuant to Local Rule 108(h). The Court treats all facts that were not disputed as conceded. *Id.*

The DBA will undertake a credit review of the institutions, charge an adequate rate of interest to service the bond interest rate, and pay various items, including fees for the services of the DBA, the trustee and any other parties. Security for the bonds issued by the DBA will include investments, program loans, and an escrow account funded with a portion of the loan proceeds, as well as the guarantee from the Secretary, which will obligate the full faith and credit of the United States to insure the payment of interest and principal on the bonds. 20 U.S.C. § 1132c–2(d). The Secretary has authority to issue letters of credit and insurance up to $375,000,000.00, but only to the extent provided in advance by appropriations acts. 20 U.S.C. § 1132c–3(a). The DBA will also have construction oversight responsibilities as well as serving as the focal point of information for the HBCU Capital Financing Program.

To begin the process of selecting a designated bonding authority, the Department of Education published two separate solicitation notices in *The Bond Buyer*, a trade publication directed to professionals and others in the bond market, informing those interested that it expected to issue a request for proposals from parties interested in serving as the DBA. Administrative Record (*hereinafter,* "A.R.") 10001, 10002. The Department asked interested parties to submit requests for the expected solicitation package. *Id.* The Department received in excess of 60 requests for the solicitation package. A.R. 10003–89. Secretary of Education Richard W. Riley delegated the responsibility for selecting the DBA to David Longanecker, the Assistant Secretary for Postsecondary Education. By letter dated May 31, 1994 the Department sent the solicitation package to the various requesting parties, including Plaintiffs. A.R. 10009, 10090.

The solicitation package provided a description of the HBCU Capital Financing Program, the services that the DBA would be expected to perform, the required contents of a proposal, and the selection criteria. A.R. 10090–99. The package informed proposers that "[t]he Secretary will select the DBA based on the selection criteria outlined in Exhibit B." A.R. 100923. That exhibit listed and described 13 factors:

1) Minority ownership;

2) Existence of trained staff to perform the various duties of the DBA;

3) Capacity to manage the issuance of a large offering of debt securities;

4) Financial position and stability relative to industry norms;

5) Approach in performing the requirements of the program;

6) Experience and resources available and commitment to providing business development services;

7) Past performance on previous government contracts;

8) Ability in addressing the special needs of minority business and prior record in using minority business;

9) Proposal with respect to cost, including the approach of the cost proposal;

10) Ability to comply with for-profit requirement;

11) Cohesiveness of the DBA and any subcontractors;

12) Senior management stability; and

13) No conflict of interest.

A.R. 10098–99. The package explained that the proposals would be graded on a scale of 1 to 10 for each of the 13 criteria and then "quantitatively ranked." The package further advised that "[i]t is possible that oral interviews may be held to fully develop a qualitative recommendation." A.R. 10099. Further, the package noted at least twice that "[t]he selection of the DBA will be made on the basis of . . . utilization of minority personnel," and that "[i]t shall be a positive factor if the proposer is a minority owned business." A.R. 10096.

The Department received eleven proposals, eight of which were found to be responsive to the Request. A.R. 10099. Among the proposals was a joint venture proposal from Plaintiffs Grigsby, Brandford & Co., Inc. and A.H. Williams & Co., Inc.. A.R. 20415–715, 2001A–411. The Grigsby Brandford/A.H. Williams venture would be 55 percent owned by Grigsby, Brandford, a minority-owned firm, and 45 percent by A.H.

Williams, a majority owned firm. A.R. 20419, 30389. PMC, the firm ultimately selected by the Department of Education, is entirely minority owned. A.R. 20002.

The Department established a Technical Evaluation Panel of seven people (two of whom could not participate in full) for the sole purpose of reviewing the eight responsive proposals. A.R. 30023–27H. Six panelists completed evaluations tracking the selection criteria announced in the solicitation package.[2] A.R. 30023–27H, 30370, 30031–318. The top three proposals in terms of cumulative points were: (1) M.R. Beal (628 points); (2) PMC (597 points); and (3) Grigsby, Brandford/A.H. Williams (592.5 points). A.R. 30370, 30387.

The Department invited the three top-scoring finalists for oral interviews with the panel members on August 11, 1994. The Department provided each finalist with the opportunity to make a 15–20 minute presentation, and specifically asked the proposers to explain how their teams would function and interrelate. A.R. 30524–7. Five panelists heard the presentations of the three finalists on August 11, 1994.[3] After the conclusion of the interviews, two of the panelists ranked PMC as their first choice, and three of the panelists ranked GB/AHW as their first choice. A.R. 30370, 30391.

The panelists prepared narrative summaries of their post-interview comments and recommendations. A.R. 30388, 30389. Despite their recommendation of GB/AHW, the three panelists noted the significant negative factor that A.H. Williams was majority-owned and would control 45 percent of the DBA created by the GB/AHW proposal. A.R. 30388–389.

A financial advisor from the firm of Smith Barney Inc. also separately rated the written proposals and observed the oral interviews. A.R. 30319–361, 30393. This financial advisor rated all of the proposals of the finalists as acceptable. A.R. 30333, 30347, 30361. Although the advisor initially gave PMC a higher numerical score than its two primary competitors (97 as opposed to 84 for GB/AHW and for M.R. Beal) (A.R. 30363) on the basis of the written proposals, after the oral presentations he rated the GB/AHW Team as the best for the program. A.R. 30364.

On Monday August 29, 1994, Assistant Secretary Longanecker, Claudo R. Prieto, the Deputy Assistant Secretary for Higher Education Programs, Ernest G. Green, Billy Webster and Leslie Thornton met with Secretary Riley. Declaration of Richard W. Riley, ¶ 2. Mr. Green is Chairman of the Advisory Board of the Historically Black Colleges and Universities Capital Financing Program, and was appointed to that Board by the Secretary.[4] Mr. Webster was the Secretary's Chief of Staff. Ms. Thornton is his Deputy Chief of Staff; as a lawyer, she also regularly provides him with legal advice. *Id.*

The purpose of the August 29 meeting was to inform the Secretary of the results of the Department's process for evaluating proposals submitted by the various interested parties and to allow him to consult with his advisors regarding final selection of a DBA. At the Secretary's request, those present gave him their individual views. This was the only time that this group of individuals met to discuss the matter. *Id.*, ¶ 3.

During the meeting, Assistant Secretary Longanecker and the others informed the Secretary of the results of the panel review process and discussed final selection of the

---

**2.** One of the initial panelists withdrew because he was unable to participate in oral interviews scheduled for August 11, 1994. A.R. 30368.

**3.** One of the six panelists who rated the written proposals was unable to attend the oral interviews. A.R. 30392.

**4.** Congress established the HBCU Capital Financing Advisory Board in order to, *inter alia,* "provide advice and counsel to the Secretary and the designated bonding authority". 20 U.S.C. § 1132c–6(a). Congress provided further that:

> The Advisory Board shall meet with the Secretary at least twice each year to advise him as to the capital needs of historically Black colleges and universities, how those needs can be met through the program authorized by this part, and what additional steps might be taken to improve the operation and implementation of the construction financing program.

*Id.* The nine members of the Board are appointed by the Secretary. 20 U.S.C. § 1132c–6(b)(1).

DBA.[5] After the briefing, the Secretary took under advisement the various views and information presented to him and on September 2, 1994 made his final selection of a DBA. *Id.,* ¶¶ 4, 5.

According to his Declaration filed with this Court, it was evident to the Secretary that GB/AHW and PMC both had the technical ability to do the job and perform the role of a DBA. Given the one vote difference in the panel recommendations, his attention focused on the preference stated in law that he utilize minority firms in this program to the "maximum extent feasible." *Id.* ¶ 6. The Secretary stated that he considered the fact that GB/AHW had proposed a joint venture company to serve as the DBA that would be 45 percent owned by A.H. Williams, a majority-owned firm, while PMC is entirely minority owned. The Secretary also noted that while A.H. Williams had greater education lending experience in general, PMC itself had experience doing bond work directly with historically Black colleges. *Id.,* ¶ 7.

Given the unique community of historically Black colleges that the program is intended to benefit, the Secretary determined that it would best be served by an entirely minority-owned bonding authority. Since he was presented with finalists found to be capable of doing the job, the Secretary believed the minority ownership factor was entitled to greater weight than the single, swing vote difference in the review panel recommendations. Thus, to carry out the statutory direction and purpose, the Secretary chose PMC to serve as the bonding authority. *Id.* ¶ 8.

Accordingly, the Secretary memorialized that decision in the following memorandum dated September 2, 1994:

**5.** The Secretary's handwritten notes of the August 29 meeting were produced by Plaintiffs and state the following:

Meeting with Ernie Green
Monday, August 29, 1994
10:00–10:45

*Desig. Bonding Authority*—Adivs.Comm. & Staff rec.—
Looked at 8 who bid—
Interviewed final 3—maj. but not unanimous (higher ed. work)

I have reviewed the three applicants that were recommended by the external reviewers for the Designated Bonding Authority for the Historically Black College Capital Financing Program. After careful consideration of their strengths and weaknesses, and recognizing that each of them can do the tasks required, I have selected Pryor McClendon, Counts & Co. as the organization that best meets the needs of the Department. You are authorized to negotiate with that group.

*Id.,* ¶ 8; A.R. 30506.

### III. Defendants' Motion For Summary Judgment Must Be Granted

#### A. The Secretary's Choice of DBA was Neither Arbitrary, Capricious, Nor an Abuse of Discretion

Plaintiffs contend that the "Secretary's selection of PMC as the DBA and the award to PMC of the Agreement to Insure under the solicitation is arbitrary, capricious, an abuse of discretion, and in violation of statutory and regulatory provisions." Complaint, ¶ 27. Because this case arises under the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq.,* the Secretary of Education's selection must be affirmed unless it is "arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ So long as the Secretary's decision had a rational and proper basis, then this Court must sustain the decision, and judgment for Defendants is warranted as a matter of law. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (holding that judicial inquiry in cases involving the review of an agency action focuses on whether the agency has examined the relevant factors and articu-

*Grigsby, Brandford & Co.*— & *A.H. Williams & Co.*(45% non-minority)
Prior, McLendon, Count Co.—(Minority owned to core) (N.Y. & Atla.)
Howard Tugaloo (bond work for them)
M.R. Bealle—N.Y.
Exhibit 10, attached to Plaintiffs' Motion for Summary Judgment.

lated "a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (citations omitted). Courts may not substitute their own judgment even though differing results may well be reasonable. *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The party challenging the agency decision bears a " 'heavy burden' of showing that the award decision 'had no rational basis.' " *Saratoga Development Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994).

■ Plaintiffs make several arguments in support of their assertion that the Secretary's choice of PMC as the DBA lacked a rational · basis. Given the fact that the administrative record provides ample evidence of the reasons for and rationality of the Secretary's decision to select PMC as the DBA for the HBCU Capital Financing Program, Plaintiffs' arguments must fail.

The record reveals that throughout the entire selection process, the three finalists were closely ranked, and no one applicant stood out as demonstrably more qualified than the others. For example, at the end of the proposal evaluation stage, the three finalists possessed the following cumulative scores: M.R. Beal 628; PMC 597; and GB/AHW 592.5. A.R. 30387. Thus GB/AHW ranked third at the conclusion of the evaluation of the written proposals. It was only after oral presentations that GB/AHW rose to first place, as a result of three panel members ranking GB/AHW first, and two ranking PMC first. One of the panel members who recommended GB/AHW as his or her first choice selected GB/AHW over PMC by a narrow margin of two points. A.R. 30387, 30391. Furthermore, although the Secretary's financial advisor eventually recommended the selection of GB/AHW, he too did so only after oral presentations. Before the presentations, he had rated PMC significantly higher than the other two finalists, giving it 97 points, and giving 84 points to both GB/AHW and M.R. Beal. A.R. 30319, 30363

Accordingly, PMC generally rated higher than Plaintiffs on numerical scoring scales, while GB/AHW fared better after oral presentations. Clearly, there was a rational basis for the Secretary to conclude that each of the finalists was well qualified to perform the responsibilities of the DBA based on the established criteria. A.R. 30506, Riley Decl. With no clear frontrunner, the Secretary needed to make a selection from amongst three qualified candidates.

Indeed, as counsel for Plaintiffs conceded during oral argument, the Secretary was not required to "rubber stamp" any recommendation made by the panel. Congress specifically provided the Secretary with the statutory discretion to select the criteria for evaluation of potential DBAs, as well as to make the final selection itself.[6] 20 U.S.C. §§ 1132c–2(a) and 1132c–4(1)(B). *See also San Luis Obispo Mothers for Peace v. N.R.C.,* 751 F.2d 1287, 1327 (D.C.Cir.1984) (noting that top agency officials are free not to accept the advice of members of their legal and technical staff and no inference of bad faith can be derived from their failure to do so, because the President appointed them, not their staff, to administer the agency).

The Secretary testified that throughout the selection process, he sought to implement the mandate of 20 U.S.C. § 1132c–7 to use minority businesses to the maximum extent feasible. Riley Decl., ¶ 6. That section provides that:

> In the performance of and with respect to the Secretary's effectuation of his responsi-

---

**6.** Contrary to Plaintiff's contention, this discretion was not eliminated when the Secretary delegated his authority to choose the DBA to Assistant Secretary Longanecker. The Department of Education's Departmental Directive regarding Delegations of Authority at section VII, A states that "[w]hen authority is delegated, the delegator retains the original delegated authority." Exhibit C to Defendants' Combined Opposition to Plaintiffs' Motion for Summary Judgment and Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (filed October 20, 1994). Because the statutory amendments creating the HBCU Capital Financing Program vest decisionmaking authority for selection of the DBA in the Secretary of Education, the Secretary maintained that authority even though he had made a general delegation of authority to the Assistant Secretary.

bilities under section 11323c–4 of this title and to the maximum extent feasible in the implementation of the purposes of this part, minority business persons, including bond underwriters and credit enhancers, bond counsel, marketers, accountants, advisors, construction contractors, and managers should be utilized.

Certainly, implementation of a clear Congressional mandate by an agency qualifies as "a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

Based on Congress' clear intent to maximize minority participation in the HBCU Capital Financing Program, the Secretary was entitled—perhaps even obligated—to select the firm using the greatest percentage of minority participation once the evaluation process had identified three well qualified finalists. In this case, the record demonstrates that PMC's DBA proposal would utilize a significantly higher percentage of minority business persons than Plaintiffs' joint venture, GB/AHW.[7] Accordingly, selection of the most qualified, most "minority" DBA among three closely ranked candidates was not an abuse of discretion, but was rather a rational and proper carrying out of the Secretary's statutory duty.

■ In response, Plaintiffs argue that the Secretary's decision was nevertheless irrational because it was based on a mistake of fact.[8] There are two bases on which this arguments rests. First, Plaintiffs contend that the Secretary's decision was irrational because the Secretary, in selecting PMC to be the DBA, selected an entity that did not submit a bid; Plaintiffs argue that the entity that submitted the bid was "Team PMC"— not PMC. Second, Plaintiffs contend that the Secretary was misinformed about the minority-ownership factor of the entity it did select—that "Team PMC" is not a wholly minority owned firm, as the Secretary believed, but rather that it is a joint venture between minority and non-minority owned firms. Plaintiffs rely on both of these arguments to demonstrate that the Secretary did not select a DBA that was wholly minority owned, as the Secretary believed and stated in his memorandum of September 2, 1994.

Specifically, while conceding that PMC itself is "an African American owned investment banking company" (A.R. 20002), Plaintiffs insist that PMC itself (as well as the

---

7. Contrary to Plaintiffs' repeated assertion (*see, e.g.*, Plaintiffs' Motion for Summary Judgment at 8), the RFP states that the 13 listed factors will carry "equal weight."

On the contrary, the RFP states that the proposals will both be "quantitative[ly]" and "qualitative[ly]" ranked, and stressed the importance of minority ownership at least twice in addition to including it in the list of the 13 factors themselves. A.R. 10098–10099. Finally, it is clear that all factors were not to be weighted equally because the final factor, lack of conflict of interest, was absolute, and not weighted at all: "ED will not consider any proposal that indicates an actual or apparent conflict of interest." A.R. 10099. Accordingly, even though the Request for Proposals stated that "a matrix will be established ... with each respondent measured against the 13 items listed above" and that "[e]ach of the 13 items will be graded on a scale of 1 to 10" (A.R. 10099), only the first 12 factors were ranked, with the thirteenth not given a score at all. *See, e.g.*, A.R. 30031–30303.

8. Plaintiffs attempt to argue that, under federal law, a business that is 51% minority owned should be viewed identically to a business that is 100% minority owned. This argument not only ignores significant factual distinctions, but would weaken the statutory provisions governing the HBCU Capital Financing Program explicitly mandating the Secretary to utilize *"minority business persons*, including bond underwriters and credit enhancers, bond counsel, marketers, accountants, advisors, construction contractors, and managers" to the "maximum extent feasible". 20 U.S.C. § 1132c–7. (emphasis added) Accordingly, the Secretary was *obligated* to determine which DBA proposal would utilize the maximum number of individual minority business persons.

It is a reasonable conclusion that a business that is 100% minority owned would utilize more minority business persons than one that is only 51% minority owned. By the same token, although Plaintiffs insist that A.H. Williams, an admittedly non-minority owned business, would utilize minority staff in the project, it is a reasonable interpretation of the statute to conclude that awarding the contract to a business *both owned and run* by minority persons would satisfy the statutory mandate to a greater degree than would awarding the contract to a business that is non-minority owned but that pledges to assign specific duties to minority personnel.

entity that submitted the proposal on behalf of PMC) is not "entirely" minority owned. Plaintiffs also contend that the responsive bidder to the RFP was not PMC but was in fact a joint venture known as "Team PMC" consisting of PMC itself, Coastal/PMC (a joint venture between PMC and the non-minority firm, Coastal Realty Partnership), McKissack & McKissack [9] (also included in the GB/AHW proposal), H.J. Russell & Co.[10] (whose precise ownership structure is not stated), and an unspecified financing team which may or may not include minority business persons or entities. Exh. 5, A.R. II, 20001A, 20003–08, 20079.

After a very careful review of the five-volume administrative record the Court concludes that Plaintiffs misread—and mischaracterize—that record.

First, Plaintiffs concede—and the administrative record is clear—that PMC's three principals are African–American, and that all three are graduates of HBCUs. A.R. 20002. Although the record does not clearly demonstrate that 100% of the ownership of the firm is in minority hands [11], what it does clearly show—contrary to the interpretation put forth by Plaintiffs—is that PMC, and only PMC would be the bonding authority if selected as the DBA, whereas if GB/AHW was selected as the DBA, the minority firm of Grigsby Brandford would share the role of bonding authority with its joint venture partner, the non-minority firm of A.H. Williams.

Ample evidence can be found in the record demonstrating that Plaintiffs GB/AHW were submitting their proposal as a formal corporate joint venture between minority and non-minority partners, as opposed to PMC, which was submitting its proposal as a solely minority owned entity. To start with, the cover letter to Plaintiffs' proposal is submitted on letterhead bearing the printed insignias of both Grigsby/Brandford and A.H. Williams. A.R. 20415. GB/AHW's cover letter goes on to indicate that inquiries regarding the proposal should be forwarded to *either* Calvin Grigsby, President of Grigsby Brandford or to Freddie Gallot, Jr., Vice President of A.H. Williams. A.R. 20417. In contrast, the cover letter for PMC's proposal is on the letterhead of Pryor McClendon Counts and Company, Inc., (i.e., PMC) only, inquiries are referred to William Fisher, Executive Vice President of PMC, and the letter is signed by Raymond J. McClendon. A.R. 20001A. Although the PMC cover letter lists (1) Pryor, McClendon, Counts & Co., Inc., (2) Coastal/PMC [12], (3) H.J. Russell & Company and (4) McKissack & McKissack" as members of " 'Team PMC,' " nothing in this letter or the proposal indicates that these four firms are to become joint venture partners in a single "Team PMC" entity comparable to the corporate structure contemplated for GB/AHW.[13]

In fact, when asked to state the "legal corporate authority to perform all of the services contemplated" by the DBA, Plaintiffs stated that it would form a "new corporation, that will serve as the DBA" which would be owned 55% by Grigsby Brandford Co., and 45% by A.H. Williams. A.R. 20419. Neither PMC nor M.R. Beal included a similar statement regarding the formation of a new corporation or a special purpose joint venture to perform the services of the DBA, because no such entities were contemplated in their proposals. Further, although Plain-

---

**9.** McKissack & McKissack is the "oldest African American owned architectural firm." A.R. 20003 It was founded in 1905, and has 90 years of experience, much of which has been for HBCUs. The original founders and the fifth generation of management are graduates of HBCUs. *Id.* McKissack & McKissack was included as a member of the "team" submitted by all three of the finalists for the position of DBA—including Plaintiffs as well as PMC. A.R. 20769 (M.R. Beal); 20459 (GB/AHW); 20001A (PMC).

**10.** Notably, H.J. Russell's named partner is said to be a HBCU graduate.

**11.** It is unfortunate that the record fails to include the exact percentage of minority ownership of PMC. From hindsight—always better than foresight—it is clear that such precise data would have been useful.

**12.** As noted above, Coastal/PMC is a joint venture between PMC and Coastal Realty Partnership.

**13.** Indeed, it is significant that one of the "Team PMC" members is McKissack and McKissack, a minority-owned architectural firm which is listed as a participating entity in the proposals of all three finalists, including that of Plaintiffs'. A.R. II, 20001A, 20003–08, 20079.

tiffs suggest that "Team PMC" was obligated to provide information regarding their corporate structure but failed, there is nothing in the record to suggest that the Defendants, the panel of evaluators or the financial advisor believed that any information regarding PMC's corporate structure was missing.

From the Department's initial listing of proposals received in July of 1994, through the Secretary's September 2, 1994 decision, the Department and those involved in the selection process fully understood that the PMC bid proposed only PMC itself to serve as the DBA.[14] In the Department's July 19, 1994 listing of proposals, it explained that "[t]he entity to serve as DBA is listed first followed by the team it assembled that will play a role in the development and execution of the program[.]" A.R. 30017–30018. In item 6 of the listing, the Department first named Pryor, McClendon Counts, and Co., Inc. A.R. 30019. Coastal/PMC, H.J. Russell & Company, and McKissack and McKissack were listed under the prospective DBA in an indented fashion clearly denoting their status as subcontractors or secondary participants. Id. As to Plaintiffs, neither Grigsby Brandford & Co., Inc., nor A.H. Williams & Co., Inc. was indented. As to M.R. Beal & Company, it also was listed first, not indented, but was then followed by its six subcontractors, listed in an indented fashion. Id. at 30019–30020.

The Department's listing of PMC as the "entity to serve as DBA" is hardly surprising as the first sentence of the text of the PMC proposal states:

> Pryor, McClendon, Counts & Co., Inc. is pleased to present *its* qualification to serve the Department of Education as the Designated Bonding Authority (DBA) for the Historically Black College and University Capital Finance Program.

A.R. 20002 (emphasis added).

The five reviewers on the review panel, as well as the sixth who only evaluated the written proposals, clearly understood the bidding entity to be PMC itself and not a joint venture. When asked to write in the "name of business" on their evaluation review forms, they all wrote "Pryor, McClendon" or some minor variation of "Pryor, McClendon,

Counts & Co." A.R. 30063, 30095, 30159, 30191, 30223, 30271. Similarly, the readers identified PMC as the sole bidder in their written comments. Id.

The Department also identified the sole bidding entity's identity as PMC in preparing the agenda for the oral presentations. Thus, the agenda included time for a presentation by "Pryor, McClendon, Counts, & Co., Inc." and, recognizing that Plaintiffs' proposal was submitted on behalf of a joint venture, listed a presentation time for "Grigsby Brandford & Co., Inc. and A.H. Williams & Co." A.R. 30393. Further, the Department in its review process also identified PMC as the sole bidder for the DBA: "the top three proposers were M.R. Beal & Co.; Pryor, McClendon, Counts & Co., Inc.; and Grigsby Brandford & Co., Inc./A.H. Williams & Co." A.R. 30370. Finally, the review panel narrative recommendations and voting results plainly discuss the Pryor, McClendon, Counts & Co., Inc. proposal, not that of any purported "joint venture." A.R. 30388–30391.

Plaintiffs rely on the reference in PMC's proposal to itself and its subcontractors as a "team" as evidence of the fact that PMC was submitting a proposal on behalf of a joint venture. The record strongly suggests, however, that PMC's proposal was worded in this manner simply to comply with the Department of Education's Request for Proposals which specifically requested that applicants present themselves as "teams" consisting of the DBA, and all other participants included in the proposal, to help carry out the myriad duties of the DBA. A.R. 10096 ("Your proposal should include a detailed list of the team assembled by your firm that will play a central role in the development and execution of the HBCU Capital Financing Program.")

Accordingly, all three finalists presented themselves as "teams" with a lead organization (the stated DBA) and affiliated subcontractor-type organizations. *See, e.g.* A.R. Volume 5, tab 16 (the exhibits used by the finalists at their oral presentations), *see also* A.R. 30192 (suggesting that PMC/Coastal is merely an organization associated with PMC's Team). When Team PMC presented a diagram of its structure to the Department,

PMC was listed at the top of the diagram as the lead organization with PMC/Coastal as an entity *underneath* its control, along with H.J. Russell & Company (assistance in development), McKissack & McKissack (architectural design), and a financing team.

Further demonstrating that PMC submitted its bid on its own behalf, and not on behalf of any joint venture, is the nature of the responses submitted by the finalists to the solicitation requirement that the bidding entity submit audited financial statements for the five years prior to their proposal. The solicitation requires that the entities bidding to be the DBA "include information with respect to [their] financial strength and copies of [their] last five annual audited financial statements." A.R. 10096. Tellingly, PMC's proposal includes copies of only its own audited financial statements but none from the subcontractors (Coastal/PMC, H.J. Russell & Company, McKissack & McKissack) which Plaintiffs try to characterize as joint venture partners. A.R. 20033–20075. M.R. Beal's proposal similarly includes copies of only its own financial statements without inclusion of those of its team's subcontractors. A.R. 20899–20999. GB/AHW, on the other hand, includes financial statements from both GB and AHW, designated as a joint venture, which would constitute the single entity to serve as DBA. This is further evidence of who the true bidding entities were with respect to these three finalists' proposals: PMC, M.R. Beal, and the joint venture of Grigsby Brandford/A.H. Williams.

Accordingly, more than ample evidence exists in the record that, contrary to Plaintiffs' assertions, the Secretary did select the entity that submitted a bid—PMC submitted a bid, and PMC was selected. When the Secretary stated in his declaration that he concluded that the program would best be served by a "100 percent minority-owned" bonding authority (Riley Decl. ¶ 8), he was referring to the distinction between PMC's proposal,

which was that of a single, minority-owned firm, and that of Plaintiffs', which consisted of a joint venture between a minority firm and a non-minority firm. Riley Decl. ¶ 7.

It was this significant distinction between PMC's and GB/AHW's proposal—that is, the difference between a wholly-minority-owned DBA and that of a joint venture comprised of a minority and non-minority owned firm—thta the reviewers focused many of their negative comments on. For example, one judge noted that Grigsby was to make up 55% of the DBA, with A.H. Williams consisting of the other 45%. A.R. 30080. This judge wrote that "other proposals [referring to PMC and M.R. Beal] have better minority ownership." *Id.* Two judges rated GB/AHW a "6" (out of 10) on this factor (A.R. 30175, 30303); another judge stated that his/her "biggest concern is the minority ownership criteria" of GB/AHW (A.R. 30256). This particular judge later wrote that "in light of the legislation and scope of the proposed DBA teaming with a majority firm to 'get the business' appears not to address the nontangible aspects of the process." (sic) A.R. 30270.[14] Thus, at least four of the six judges specifically identified the issue of GB/AHW's minority-nonminority joint venture corporate status as a "negative" factor in their evaluations.

By the same token, the judges commented favorably on PMC's status. One noted that "PMC is clearly a minority owned enterprise. Of all the proposed DBA's it's (sic) form and framework is the most in line with minority ownership." A.R. 30224; *see also* A.R. 30238 (additional positive comments about the single-firm minority ownership factor of PMC). The two judges who selected PMC over GB/AHW did so because of "the same negative reasoning outlined in the majority opinion"— that is, less favorable minority ownership, primarily attributable to the fact that the GB/AHW proposal was in the form of a joint

---

14. Defendants point out that "concerns" exist about the "sometimes problematic nature of ventures between minority and non-minority firms in bid competitions" in their Combined Opposition to Plaintiffs's Motion for Summary Judgment and Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at p. 3, n. 2. *See* A.R. 30479, 30482, Schroeder and

Alexander, "Affirmative, yes—But is it fair?," *Business Week,* July 4, 1994, at 74 ("the most questionable arrangements involve some non-minority firms whose ties to a minority firm are so tight that the two are virtually indistinguishable. At issue: just who benefits from business that public officials are trying to award to minority firms?")

venture between a minority and nonminority firm. A.R. 30389.

Furthermore, the Secretary had every reason to believe that PMC would utilize a greater number of minority businesspersons than any other finalist, including Plaintiffs. According to the administrative record, PMC clearly received the highest point totals on the minority ownership factor. In fact, three of the six judges awarded PMC perfect ("10") scores on this factor, and the other three judges rated PMC a 9 out of 10 on this factor. Out of a possible total of 60 "minority ownership" points, PMC received 57 points (an average of 9.5), while GB/AHW received the lowest of the three finalists at 45.5 (an average of 7.58), and M.R. Beal received 53 (an average of 8.83). The conclusion that PMC would best satisfy the statutory mandate that "minority business persons" be utilized to the "maximum extent feasible" (20 U.S.C. § 1132c–7) was therefore rational and sound.

Finally, Plaintiffs'.argument that the Secretary used minority status as the "only" criteria in selecting PMC is belied by the record. As described above, PMC was rated higher than Plaintiffs under the numerical scoring scale set out in the Request for Proposals, as well by the financial advisor prior to oral presentations. Accordingly, it was only after PMC had been established as one of the three closely-ranked contenders for the position of the DBA that the Secretary allowed the "minority ownership factor" to carry more weight than the "single swing vote difference in the review panel recommendations." Riley Decl. ¶ 8.[15]

■ Plaintiffs' argument that the Secretary did not give sufficient notice that minority ownership would carry decisive weight in his decision is equally unavailing. Not only does the statutory scheme require the Secretary to utilize minority-owned firms to the greatest degree feasible, as discussed above, but the Request for Proposals, in addition to separately listing the 13 factors set forth above, explicitly stated in two different places that "[t]he selection of the DBA will be made on the basis of ... utilization of minority personnel," and that "[i]t shall be a positive factor if the proposer is a minority owned business." A.R. 10096. The pre-eminent importance of minority ownership and participation could hardly be more clear.

Finally, Plaintiffs' argument that the Secretary never stated that "100% minority ownership" would be a requirement for selection is unpersuasive in view of the explicit language of the RFP.[16] If the Secretary gave notice that minority ownership would be considered a "positive factor," and that it would be ranked on a scale of 1 to 10 (at least in terms of the quantitative evaluation), then the inevitable conclusion is that the greater the amount of minority ownership of the proposal, the more positively that proposal would be rated.[17]

15. Plaintiffs attempt to argue that there was no "single swing vote difference" between PMC and GB/AHW, but rather, that the review panel held a vote and made a "single recommendation." Plaintiffs' Memorandum in Support of their Motion for Summary Judgement at 29. Plaintiffs' argument points out a distinction without a difference. Although the panel's vote resulted in the recommendation of GB/AHW, the voters split their vote, as discussed above, with three members voting for GB/AHW, and two voting for PMC.

16. Plaintiffs additionally contend that, had they known that "100% minority ownership" would have been a factor in the selection of the DBA, they then would have prepared their proposal with Grigsby, Brandford as the proposed DBA, and A.H. Williams as a mere "subcontractor." Plaintiffs' Reply Memorandum in Support of their Motion for Summary Judgment at page 17. It is pure speculation to assume that Plaintiffs'

proposal would then have received identical evaluations by the judges on every factor other than minority ownership when its proposal lacked A.H. Williams—a firm with, as Plaintiffs insist, significant experience with higher education institutions—as the joint venture partner to Grigsby, Brandford.

17. An apt analogy is that of a job description stating that "three years of relevant experience is required." An applicant with three years of relevant experience could hardly complain that no notice was given if she was passed over for an applicant with five years of relevant experience. Just as when the amount of experience of an applicant is deemed a positive factor and it follows that the more experienced applicant would be rated more positively, similarly when "minority ownership" is deemed a positive factor, it follows that the applicant with a higher percentage of minority ownership would be rated more positively. Such is the case here.

■ Accordingly, for the reasons stated above, the Secretary's choice of PMC as the DBA was not only rational, but was fully supported by the administrative record. Clearly, the Secretary offered "a satisfactory explanation for [his] action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Therefore, Plaintiffs' APA challenge fails.[18]

### B. The Defendants Have Not Violated CICA and the FAR

Plaintiffs allege that the selection of PMC and the solicitation process which led to that firm's selection violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 251 et. seq., and the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1.000 et. seq., as well as the Department of Education's Acquisition Regulation, by failing to "evaluate the proposals to serve as the [DBA] solely on the criteria, standards, and evaluation factors specified by the Secretary" in the solicitation notice. Complaint, ¶¶ 33, 35. In addition, Plaintiffs allege violations of the FAR and the Department's Acquisition Regulation because of failure to "publish timely notice of any changes or amendments to the criteria, standards, and evaluation factors utilized by the Secretary in overturning the evaluation and rankings of the Review Panel and financial adviser in selecting the DBA". Complaint, ¶ 35. Finally, Plaintiffs charge that the Secretary "failed to consider adequately the rankings, ratings and recommendations of both the Review Panel and the Financial Advisor, and failed to document the basis for his decision." Complaint, ¶ 35.

In sum, Plaintiffs' charge rests on their argument that the Secretary's failure to follow the recommendation of the Review Panel and of the financial advisor constitutes an illegal departure from the procedures established in the Request for Proposals that unfairly prejudiced Plaintiffs and thereby renders the award of the DBA contract to PMC invalid. *See* Plaintiffs' Memorandum in Support of their Application for Temporary Restraining Order and Motion for Preliminary Injunction at 26–28.

■ Plaintiffs' allegations are misplaced, however. Neither CICA nor the FAR apply to the selection of the DBA under the HBCU Capital Financing Program for two reasons. First, CICA and the FAR apply only to procurements and acquisitions, and the selection of a DBA constitutes neither. Second, the particular statutory instructions regarding the Secretary's selection of the DBA bring the selection within the ambit of CICA's savings clause and therefore "supplant" CICA's requirements.[19]

CICA requires that "an executive agency in conducting a procurement for property or services shall obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A). However, it is well settled that federal procurement laws and regulations, such as CICA and the FAR, apply only when an agency, such as the Department of Education, acts as a commercial purchaser of goods and services. *See, e.g., United States v. Citizens & Southern National Bank*, 889 F.2d 1067, 1069 (Fed. Cir.1989) (applying Federal Property and Administrative Services Act of 1949). Hence CICA applies only to actual government "procurement" of goods or services. *Id.*

The relevant case law leads to the conclusion that the designation of a DBA is not such a procurement. In *Citizens & Southern National Bank, supra*, the court held that the Department of Treasury's selection of a national bank to serve as a financial agent for a new system of cash concentration and reporting was not a procurement contract re-

---

18. Plaintiffs also allege a violation of the APA because "[t]he Secretary failed to publish its notice for the RFP in the Federal Register as is required by the enabling statute." Complaint, p. 15. Plaintiffs however can allege no harm or prejudice as a result of this failure. The administrative record shows, and Plaintiffs must concede, that the publication of the RFP in the trade publication *Bond Buyer* elicited an extensive re-

sponse and a large number of submissions, including that of Plaintiffs themselves.

19. As discussed below with regard to the inapplicability of the FAR to the selection of a DBA, the Department of Education Acquisition Regulation similarly does not apply to the instant action.

quiring that the selection process be governed by the federal procurement law at issue in that case. *Id,* 889 F.2d at 1069. Instead of a procurement, the court analogized the designation of a financial institution to the "appointment of public employees, which is not a matter of contract even when terms and conditions guide the employment relationship." *Id.* at 1070 (citations omitted). Accordingly, because the designation of the DBA resembled the conferral of agency status, it did not constitute a procurement. *Id.*

Similarly, in *National Loan Servicenter v. Department of Housing and Urban Development,* GSBCA No. 12193–P 93–2 B.C.A. (CCH) P25,853, 1993 WL 59339 (March 2, 1993), the court held that the Department of Housing and Urban Development's (HUD) procurement of the services of a "Master Servicer" that would both manage and service loans that were previously made by HUD constituted the conferral of status rather than the procurement of services. Accordingly, the Court held that the Board of Contract Appeals lacked jurisdiction, since it has jurisdiction over agency procurement only when an agency 'is acting as a commercial purchaser of goods and services' and not when it is designating a financial agent, i.e. conferring a status upon a private entity." *Id.*

In another similar case, *Saratoga Development Corp. v. United States,* 21 F.3d 445 (D.C.Cir.1994), the Court of Appeals for this Circuit held that neither CICA nor the FAR applied to the Pennsylvania Avenue Development Corporation's ("PADC") selection of a developer under the Federal Triangle Development Act. The Court held that although PADC, a wholly government-owned corporation, was itself covered by CICA and the FAR, the selection of a developer for the project did not constitute "procuring" for purposes of CICA or "acquiring" for purposes of the FAR. *Id.* at 452–53. In so holding, the Court of Appeals noted that PADC's choice of a developer under the Federal Triangle Act was distinguishable from the government's role in choosing contractors when the government itself serves as the developer:

[T]he FAR applies only to "acquisitions" . . . the CICA applies only to government "procurements". These words describe what the PADC does when it acts as a developer in its own right, choosing contractors to construct public parks and the like. But when the PADC conducted "development competitions" to select developers for projects like Market Square of the Lansburgh, it was not "acquiring" or "procuring" anything; far from expending public funds to purchase public property, the PADC was simply offering developers the right to spend their *own* funds on *private* projects. The laws and regulations guiding government construction contracts had no bearing on those procedures.

*Id.* (emphasis in original).

Just as in *Citizens & Southern National Bank, National Loan Servicenter* and *Saratoga Development Corp.,* so here too the Secretary of Education's selection of a DBA conferred status upon a private entity, and thereby more closely resembled the appointment of a public employee or agent than it resembled the procurement of any goods or services. What governs is the nature of the relationship created by the selection, and the nature here is that of the conferral of status on the DBA.

The responsibilities of the DBA in the instant action are very similar to those of the financial agent in *Citizens & Southern National Bank,* of the loan servicer in *National Loan Servicenter* and of the developer in *Saratoga Development Corp.* The Higher Education Act, as amended to establish the Historically Black Colleges and Universities Capital Financing Program, does not authorize the Secretary of Education to purchase goods or services for the Department. There are no deliverable goods or services implicated in the statute's provision for selection of a DBA. Rather, the outcome of the selection process is the designation of a bonding authority defined as a "private, for-profit corporation selected . . . for the purpose of issuing taxable construction bonds in furtherance" of the goal of the HBCU Capital Financing Program, to facilitate capital investment opportunities for historically Black colleges and universities. 20 U.S.C.

§ 1132c–1(8). It is the entity selected to act as DBA, rather than the government, which will thereafter issue bonds and make loans to credit-worthy institutions. The DBA will be responsible for credit reviews of the institutions and charging adequate rates of interest on loans. The DBA will have construction oversight responsibilities for the various institutions' projects which it finances. The Department of Educations's role is simply to act as guarantor on the bonds issued by the DBA. *See* 20 U.S.C. §§ 1132c–2(b), 1132c–2(d).

Just as in the three cases described above, the selection of the DBA under the HBCU Capital Financing Program merely constitutes the creation of a status rather than the procurement of goods or services. As such, neither CICA nor the FAR apply to the selection of the DBA under the HBCU Capital Financing Program.

■ A second, independent reason that CICA and the FAR do not apply in this case is that the specific selection process outlined in the 1992 Amendments to the Higher Education Act falls within the CICA savings clause, 41 U.S.C. § 253(a)(1)(A). CICA, by its terms, is inapplicable where another statute expressly authorizes its own procurement—or, in the instant case, selection—procedures. CICA contains a savings clause which requires that:

> except in the case of procurement procedures *otherwise expressly authorized by statute,* an executive agency in conducting a procurement for property or services—
>
> (A) shall obtain full and open competition through the use of competitive procedures
> . . .

41 U.S.C. § 253(a)(1)(A).

In *Saratoga Development Corp., supra,* our Court of Appeals applied this savings clause, holding that the procedures for selection of a developer for the Federal Triangle development project were to be used instead of the procurement and acquisition schemes provided in CICA and the FAR. The Court first recognized the "hybrid", public/private nature of the Federal Triangle development project, concluding that Congress "could rationally have instructed the PADC to use

*either* of the two sets of procedures", CICA or the FAR, or those provided in the Federal Triangle Development Act. *Id.* (emphasis in original). Yet, the Court further noted that "the general tenor of the PADC's procedures is far less rigid and bureaucratic than that of the FAR", and, moreover, "specific tensions" existed, such as the variance in latitude to reject submissions under the FAR as opposed to the PADC's development competition procedures. *Id.* Thus, given this "tension" between procurement and acquisition guidelines of CICA and the FAR and the procedures for the PADC's development competitions, the Court concluded that the PADC procedures were intended to take the place of the former regulatory schemes. This was held to be so particularly in light of the fact that the PADC development competition procedures were enacted subsequent to CICA and the FAR. *Id.* at 453–54.

These aspects of the analysis undertaken by our Court of Appeals in *Saratoga Development Corp.* are applicable to the instant action. A comparison of the selection procedure set forth in 20 U.S.C. § 1132c–4 reveals tensions between the "rigid and bureaucratic" tenor of the regulatory schemes under the FAR and CICA and that of the selection procedures for the DBA under the HBCU Capital Financing Program. The relevant statutory sections set forth a specific procedure for the Secretary's selection of a DBA for the HBCU Capital Financing Program. Specifically, this section provides that the Secretary:

> (1) shall, within 120 days of July 23, 1992, publish in the Federal Register a notice and request for proposals for any private for-profit organization or entity wishing to serve as the designated bonding authority under this part, which notice shall—
>
> (A) specify the time and manner for submission of proposals; and
>
> (B) specify any information, qualifications, criteria, or standards the Secretary may determine to be necessary to evaluate the financial capacity and administrative capability of any applicant to carry out the

responsibilities of the designated bonding authority under this part.

*Id.*

It is clear that this provision is intended to set forth the HBCU's own unique selection procedures for the DBA, and, accordingly, CICA's savings clause exempts the selection of DBA from CICA's requirements. This is true even though the Higher Education Act does not expressly waive the application of federal procurement laws such as CICA. *See Saratoga Development Corp., supra,* 21 F.3d at 453 ("[i]n a savings clause, the CICA specifies that its competition requirements do not apply 'in the case of procurement procedures otherwise expressly authorized by statute' ").

■■■ Thus, under *Saratoga Development Corp.,* the provision of a separate selection scheme for the DBA in the HBCU Capital Financing Program indicates that Congress intended to have that selection procedure "supplant" both CICA and the FAR. *Id.* It is clear that Congress vested broad discretion in the Secretary to fashion procedures for designation of the DBA. Accordingly, neither CICA nor the FAR apply to the selection of the DBA for the HBCU Capital Financing Program.[20] Defendants are entitled to judgment as a matter of law on all claims asserted under those provisions.[21]

*C. Defendants Have Not Violated FACA*

■■■ Plaintiffs allege that the procedures which led to the selection of PMC as the DBA violated the Federal Advisory Committee Act, 5 U.S.C.App. 2 § 1 *et. seq.* Specifically, Plaintiffs allege that "[t]he group that met with the Secretary to consider the finding of the Review [Panel] and the Financial Advisor ... constitutes a federal advisory committee" and that this "committee" similarly violated FACA and the Department's Advisory Committee regulation.[22] Plaintiffs argue that, because Mr. Green, the Chairperson of the HBCU Capital Financial Advisory Board, attended the August 29, 1994 meeting with the Secretary, such meeting constituted an unlawful meeting of the HBCU Capital Financial Advisory Board.[23] *See* Plaintiffs' Reply Memorandum in Support of their Motion for Summary Judgment at 22–23.

Congress enacted FACA in 1972 to control the growth and ensure openness of operation

**20.** Plaintiffs argue at length that because appropriated funds are used in the HBCU Capital Financing Program, the designation of a DBA under the HBCU Capital Financing Program constitutes a procurement contract subject to CICA. For this proposition, Plaintiffs cite *Rocky Mountain Trading Co.,* 1985 WL 50859, GSBCA No. 8958–P, 87–2 BCA 19,840, 1987 WL 40967 (1987), and *T.V. Travel, Inc.,* 1985 WL 50859, 1985 U.S. Comp. Gen. LEXIS 117, 85–2 CPD ¶ 640 (1985) *See* Plaintiffs' Memorandum in Support of their Motion for Summary Judgment at 37. The issue of whether or not appropriated funds are used, however, is irrelevant where, as here, the program statute expressly authorizes alternative procedures to those mandated by CICA.

**21.** Even if these provisions did apply in the instant case, Plaintiffs have failed to demonstrate any violation. As argued in the text above, the Secretary's decision selecting PMC as the DBA was both reasonable and in accordance with the selection criteria set out in the solicitation. Since Defendants clearly emphasized in the solicitation package that minority ownership was a positive factor in the selection of the DBA, there were no amendments or changes to the selection process that Defendants allegedly were obligated to publish. Finally, rather than "overturning" or failing to consider the evaluation and rankings of the Review Panel and financial advisor, the Sec-

retary's decision took full consideration of the closeness of the panel vote and the actual rankings of the finalists when factoring in the statutory commitment to maximizing minority owned business participation. Riley Decl. ¶¶ 7, 8.

**22.** In their Complaint, Plaintiffs alleged that the "establishment and administration" of the Review Panel, composed of non-federal employees, which conducted the initial evaluation and selection of finalists, violated FACA and the Department of Education's Regulations on Advisory Committee Management. Complaint, ¶ 37. However, in their Motion for Summary Judgment, Plaintiffs stated that they "will not pursue its FACA claim regarding the Review Panel." Plaintiffs' Motion for Summary Judgment at 41 n. 11. Accordingly, this Court will view that particular claim as having been withdrawn.

**23.** Plaintiffs also originally alleged that the HBCU Advisory Board operated in violation of FACA because minutes were not made available to them at exactly the time and place at which they were requested. Declaration of Jennifer Schneider attached as Exhibit 8 to Plaintiffs' Memorandum in Support of Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction. Nonetheless, Plaintiffs have subsequently received copies of the Advisory Board minutes.

of the "numerous committees, boards, commissions, councils and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C.App. 2 § 2(a); *see generally Public Citizen v. Department of Justice*, 491 U.S. 440, 466, 109 S.Ct. 2558, 2572, 105 L.Ed.2d 377 (1989). To achieve these objectives, the FACA places a number of procedural restrictions on those bodies that constitute "advisory committees." The statute defines an advisory committee as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established or utilized" by the President or an agency "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." [24] 5 U.S.C.App. 2 § 3(2).

Recognizing the "almost unfettered breadth" of this definition, the Supreme Court has cautioned that "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals; although its reach is extensive, we cannot believe that it was intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice," *Public Citizen, supra*, 491 U.S. at 453, 109 S.Ct. at 2566. Similarly, in *Nader v. Baroody*, 396 F.Supp. 1231 (D.D.C.1975), the Court found that FACA is limited to policy-laden deliberations. The *Nader* Court, in considering the applicability of FACA to *ad hoc* meetings, held:

Examination of the Act as a whole, and the indications found there, confirms the legislative history, and points to the conclusion that Congress was concerned with advisory committees formally organized which

the President or an executive department or official directed to make recommendations on an identified governmental policy for which specific advice is sought.

*Id.* at 1234.

Moreover, the General Services Administration (GSA) regulations, which implement FACA,[25] limit the definition of "Advisory Committee" to those groups that advise on policy issues:

"Advisory Committee" subject to the Act means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof, which is established by statute, or established or utilized by the President or any agency official *for the purpose of obtaining advice or recommendations on issues or policies* which are within the scope of his or her responsibilities.

§ 101–6.1003, Definitions (emphasis added). Under this definition of "Advisory Committee," only those groups that provide advice on issues or policies are considered advisory committees.

 Plaintiffs argue that the requirements of FACA were triggered by the presence of Ernest G. Green at the August 29, 1994 briefing of the Secretary on the progress of the selection process for the HBCU DBA. This contention is unsupported by the case law. Our Court of Appeals has held that an important factor in determining the existence of an advisory committee is the formality and structure of the group. To trigger coverage by FACA, a federal official must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose. *Association of American Physicians and Surgeons v. Clinton*, 997 F.2d 898, 914

---

**24.** Unless the "advisory committee" is composed entirely of full-time federal officers or employees, 5 U.S.C.App. 2 § 3(2)(C)(iii), it must file a detailed charter setting forth its objectives and the scope of its activity, *id.* § 9(c), give advance notice in the Federal Register of any meetings, *id.* § 10(a)(2), hold all meetings open to the public, *id.* § 10(a)(1), keep detailed minutes of each meeting, *id.* § 10(c), as well as conform with other statutory requirements specified in the Act.

**25.** FACA specifically assigns to the Administrator of the General Services Administration ("GSA") the responsibility of "prescrib[ing] administrative guidelines and management controls applicable to advisory committees ..." 5 U.S.C.App. 2 § 7(c). GSA has promulgated regulations pursuant to that authority, which includes a listing of "[e]xamples of advisory meetings or groups not covered by the Act." 41 C.F.R. § 101–6.1004.

(D.C.Cir.1992). The Department's regulations provide that similar factors are significant in determining whether a group is an advisory committee. *See* 34 C.F.R. § 11.4.

In the case at bar, the Secretary's August 29, 1994 meeting does not satisfy the definition for a meeting of an advisory committee set out above. The meeting was convened at the request of the Secretary's office to brief him on the question of selecting the DBA. In attendance at the meeting were the Secretary, his chief and deputy chiefs of staff, the Assistant Secretary for Postsecondary Education and his Deputy for Higher Education Programs, and the Chairman of the HBCU Capital Financing Advisory Committee. Riley Decl. ¶¶ 2, 3. The briefing had no structure or organization and represents the only occasion on which that group of individuals was convened. *Id.* ¶ 3. The fact that one individual, Mr. Ernest Green, was present neither transforms this informal group into a new advisory committee, nor transforms it into the HBCU Capital Financing Advisory Board, as Plaintiffs appear to contend. Rather, it is the type of *ad hoc*, unstructured meeting specifically exempted from FACA's ambit.

As stated above, our Courts have repeatedly warned that FACA is not intended "to cover every formal or informal consultation between the President or an Executive agency and a group rendering advice." *Public Citizen, supra,* 491 U.S. at 446, 109 S.Ct. at 2563.[26] An *ad-hoc* one-time meeting such as the meeting at issue in the present case is simply not covered by the statute. Accordingly, Plaintiffs' FACA claim fails.

### D. Plaintiffs' Equal Protection Claim Must Fail

▮ In their Amended Complaint, Plaintiffs have included a new fifth count alleging that (1) the Secretary's decision was made "solely on the basis of race; " and that (2) this reliance on a "racial classification violates Plaintiffs' right to equal protection of the laws." [27]

In support of this proposition, Plaintiffs cite *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Even though Plaintiffs admit that "Congress expressed a preference for minority participation" in the Program, Plaintiffs still insist that this fact "makes no difference." Plaintiffs' Reply Brief at 8. Rather, Plaintiffs appear to attack the entire nature of the Program, contending that there was no finding that minority ownership of the DBA is "substantially related" to the achievement of an "important" governmental objective under *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 564–65, 110 S.Ct. 2997, 3008–09, 111 L.Ed.2d 445 (1990).

Briefly stated, this eleventh-hour claim lacks merit. As discussed above, in part III.A., the Secretary chose PMC for reasons both related and unrelated to its minority ownership status, but certainly not "solely on the basis of race". Furthermore, Plaintiffs do not challenge the constitutionality of the authorizing statute, which specifically directs the Secretary to utilize minority businesses to the maximum extent feasible in the HBCU Program.

▮ Here, Congress expressly found that the facilities of the nation's historically Black colleges and universities have suffered from neglect and lacked access to capital funding. 20 U.S.C. § 1132c. To enable these institutions to "continue and expand their educational missions" of "fostering African American youth," Congress created this program and directed the Secretary to employ

---

**26.** In *Public Citizen, supra,* the Supreme Court expressed serious concerns about the constitutional implications of having FACA apply to every meeting between governmental policy-makers and two or more other individuals, any of whom is not in governmental service. 491 U.S. at 465–67, 109 S.Ct. at 2572–74.

**27.** After having waited until submission of the final pleadings in the briefing schedule to raise their Constitutional claim, Plaintiffs "recognize that the government has not briefed the issue." Plaintiffs' Reply Brief at 7, note 4. Plaintiffs then state, without citation of authority that "if further briefing is necessary, a preliminary injunction is appropriate." *Id.* This argument is patently without merit. The government, however, did file an additional Memorandum in Response to this argument.

minority business persons to the "maximum extent feasible." *Id.* and § 1132c–7.[28]

The Secretary has clearly carried out the direction of Congress—which direction, notably, Plaintiffs do not challenge—in selecting PMC as the DBA. No constitutional violation has occurred.

### IV. *Plaintiffs' Motion for Preliminary Injunction Must Be Denied*

■ In order to prevail on an Application for Temporary Restraining Order or a Motion for Preliminary Injunction, the Plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order. *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir. 1958) (per curiam); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977); *Sea Containers, Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); *National Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C.Cir.1991). This Circuit's Court of Appeals has directed the trial court to balance, rather than mechanically apply, these factors. "A stay may be granted with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985) (*per curiam*) (emphasis in original); *see also Holiday Tours, supra*, 559 F.2d at 843–44.

■ Application of the four factors stated above compels the conclusion that Plaintiffs' Motion for Preliminary Injunction must be denied. Although the Plaintiffs have demonstrated that they would, in fact, suffer irreparable harm from the failure of this Court to grant injunctive relief, they cannot demonstrate the existence of any of the other three necessary factors.

First, as discussed in full above, Plaintiffs' have failed to demonstrate a substantial likelihood of success on the merits. Second, the threatened injury to Defendants and others outweighs the possible harm to Plaintiffs because, as Plaintiffs acknowledge in their papers, the HBCU Capital Financing Program serves the important public interest of facilitating the access of historically Black colleges and universities to financing for much-needed capital improvements. Ongoing litigation and an injunction barring the commencement of the program would harm both the vital public interest in strengthening historically black colleges and universities, as well as the very students, colleges and universities that this program was intended to benefit. Needless to say, Plaintiffs' competitor, PMC, would also be substantially harmed by an injunction.

■ This Court recognizes that Plaintiffs will suffer harm in the form of potential lost profits, and, more importantly,[29] the loss of potential good will and useful business experience by virtue of losing the critically important role of the DBA. Nonetheless, the harm to Plaintiffs is greatly outweighed by the harm that would accrue to the historically Black colleges and universities if this program is substantially delayed. And, most importantly, the existence of irreparable harm to Plaintiffs does not overcome the conclusion that they simply have failed to show a "substantial case on the merits."

It is well established that injunctive relief is an "extraordinary remedy." *See, e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Such relief is not warranted in this

---

**28.** The constitutionality of a national remedial measure adopted by Congress is reviewed pursuant to the highly deferential standard set forth in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). It is well established that Congress has broad remedial powers under the Spending Clause and the Commerce Clause. Thus as long as Congress makes the judgment that a utilization goal is necessary, and authorizes administering agencies to implement

its objective, this Court need only review the reasonableness of the measures undertaken by the agency.

**29.** In general, economic loss alone—in particular, theoretical economic loss—"however substantial" does not constitute irreparable harm. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985).

case. Plaintiffs' Motion for Preliminary Injunction must be denied.

*V. Conclusion*

For the reasons stated above, Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment shall be **denied,** and Defendants' Motion for Summary Judgment shall be **granted.**

